UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT SOLOMON,

     Plaintiff,

v.                          Civil Action No.:  06-2214(RCL)

OFFICE OF THE ARCHITECT OF THE CAPITOL, *et. al.*,

     Defendant.

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Plaintiff, by his counsel, timely presents herewith his Opposition to Defendants' Motion to

Dismiss and Memorandum of Law in Support of his Opposition to Defendants' Motion to Dismiss

and moves the Court to said motion of Defendants'.  A proposed Order consistent with this

Opposition is attached hereto.

Respectfully submitted,

_____
 Jeffrey H. Leib, D.C. Bar #89649
Attorney for the Plaintiff
5104 34th Street, N.W.
Washington, D. C. 20008
(202) 362 - 0682
(202) 244 - 1120

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT SOLOMON,

      Plaintiff,

v.

                                Civil Action No.:  06-2214(RCL)

OFFICE OF THE ARCHITECT OF THE CAPITOL, *et. al.*,

      Defendant.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Jeffrey H. Leib
Attorney for Plaintiff
5104 34th Street, N.W.
Washington, D. C. 20008
(202) 362-0682
(202) 244-1120

August 15,  2007

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES.......................................................................................iii

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS.........................................................1

I.      INTRODUCTION....................................................................................1

II.     FACTUAL BACKGROUND....................................................................2

III.    ARGUMENT............................................................................................7

        A. CONSTITUTIONAL DUE PROCESS REQUIREMENTS.....................7

        B. BACKGROUND AND CONTEXT OF PLAINTIFF'S CONSTITUTIONAL
        DUE PROCESS PROPERTY INTEREST IN EMPLOYMENT
        AS APPLIED TO THE OFFICE OF THE ARCHITECT OF THE CAPITOL...............8

        C. ANALYSIS OF *VANOVER* V. *HANTMAN*, 77 F.SUPP.2D 91(D.D.C. 1999),
        PLAINTIFF'S PROPERTY INTEREST IN EMPLOYMENT; AND
        DEFENDANTS' DENYING PLAINTIFF A COPY OF THE
        HEARING OFFICER'S DECISION..................................................................10

        1. WHETHER PLAINTIFF HAS A PROPERTY INTEREST IN EMPLOYMENT......10

        2. WHETHER PLAINTIFF RECEIVED DUE PROCESS.............................12

        3. *ACCARDI* REVIEW.................................................................................19

        D. DEFENDANTS NAMED IN THEIR PERSONAL CAPACITY FOR
        VIOLATION OF CONSTITUTIONAL DUE PROCESS PROPERTY INTEREST
        IN EMPLOYMENT ARE NOT ENTITLED TO QUALIFIED IMMUNITY................25

        1. THE PLAINTIFF HAS ASSERTED A VIOLATION OF HIS DUE
        PROCESS PROPERTY INTEREST IN EMPLOYMENT AND PROPERTY
        INTEREST IN CONTINUED EMPLOYMENT.............................................25

        2. PLAINTIFF'S RIGHTS WERE CLEARLY ESTABLISHED AT THE TIME
        OF THE DEFENDANTS' CONDUCT.......................................................26

        3. A REASONABLE OFFICIAL WOULD HAVE KNOWN THAT THE
        DEFENDANTS' CONDUCT WAS IN VIOLATION OF PLAINTIFF'S RIGHTS........29

E.  DEFENDANTS NAMED IN THEIR PERSONAL CAPACITY WERE NOT ACTING WITHIN THE SCOPE OF HIS OR HER EMPLOYMENT..........................32

CONCLUSION....................................................................................................................33

CERTIFICATE OF SERVICE..............................................................................................36

TABLE OF AUTHORITIES

**CONSTITUTION**
Fifth Amendment..........................................................................................1, 2, 5, 13, 26

**CASE LAW**
*American Farm Lines* v. *Black Ball Freight Service,* 397 U.S. 532, 538(1970)..........................24

*Antonuk* v. *United States,* 445 F.2d 592, 595 (CA6 1971)..........................................18

*Ashton* v. *Civiletti,* 198 U.S. App. D.C. 190, 613 F.2d 923, 928 (D.C. Cir. 1980).......................12

*Association American Railroads* v. *Costle* 562 F.2d 1310, 1312 (D.C.Cir.1977).........................28

*Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,*
403 U.S. 388, 410 (1984)...............................................................................25, 31

*Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U.S. 78, 92 n. 8 (1978)....................................18

*Board of Regents of State Colleges* v. *Roth,* 408 U.S. 564, 33 L. Ed. 2d 548,
92 S. Ct. 2701 (1972)..................................................................................11, 26

*Bridges* v. *Wixon,* 326 U.S. 135, 152-153 (1945)..........................................................17, 18

*Brinkerhoff-Faris Co.* v. *Hill,* 281 U.S. 673, 681........................................................21

*Butz* v. *Economou* 438 U.S. 478, 506 (1978)...............................................................25

*Cleveland Bd. of Educ.* v. *Loudermill,* 470 U.S. 532, 546(1985).........................................8

*Commeree* v. *Hantman et. al,* 1999 WL 1611325 (D.D.C. 1999)..............................................10

*County of Sacramento* v. *Lewis,* 523 U.S. 833(1998)........................................................32

*Doe* v. *Gates,* 299 U.S. App. D.C. 114, 981 F.2d 1316, 1320 (D.C. Cir. 1993)................11, 21, 22

*Farrel Corp.* v *U.S. International Trade Commission,* 949 F.2d 1147
(Fed.Cir. 1991).........................................................................................28

*Fausto* v. *Gearan,* 1997 WL 540809 *9.................................................................17

*Government of Canal Zone* v. *Brooks,* 427 F.2d 346, 347(5th Cir. 1970)....................................18

*Griffith* v. *Federal Labor Relations Authority,* 268 U.S. App. D.C. 491, 842 F.2d 487, 498
(D.C. Cir. 1988).........................................................................................12

*Hall* v. *Ford*, 272 U.S. App. D.C. 301, 856 F.2d 255, 265 (D.C. Cir. 1988). ........................11, 26

*Hammond* v. *Lenfest*....................................................................................................................30

*Harlow* v. *Fitzgerald*, 457 U.S. 800, 814 (1982).........................................................................25

*Hollingsworth* v. *Balcom*, 441 F.2d 419, 421 (CA6 1971).........................................................18

*Johnson* v. *United States*, 202 U.S. App. D.C. 187, 628 F.2d 187 (D.C. Cir. 1980).....................12

*Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123(1951)..........................19, 21, 23

*Konn* v. *Laird*, 460 F.2d 1318 (CA7 1972)..................................................................................18

*Larker* v. *Office of the AOC*, 1991 WL 153119 at *5(1991)........................................................24

*Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434(1982)...........................................................7

*Mazaleski* v. *Treusdell*, 183 U.S. App. D.C. 182, 562 F.2d 701, 719
(D.C. Cir. 1977)............................................................................................................................22

*Mazza* v. *Cavicchia*, 15 N.J. 498, 105 A.2d 545(1954)....................................15, 16, 18, 19, 20, 21

*Morgan* v. *United States*, 304 U.S. 1, 20(1938)...................................................................17, 18

*Moore* v. *City of East Cleveland*, 431 U.S. 494, 502(1997)........................................................32

*Morton* v. *Ruiz*, 415 U.S. 199, 235 (1974)..................................................................................17

*Ohio Bell Telephone Co.* v. *Public Utilities Commission*,301 U.S. 292, 300(1937)....................18

*Palko* v. *Connecticut*, 302 U.S. 319, 325, 326(1937)..................................................................32

*Pennsylvania R. Co.* v. *New Jersey State Aviation Commission*, 2 N.J. 64, 72............................15

*Pennsylvania R. Co.* v. *Labor Board*, 261 U.S. 72. n15...............................................................19

*Perry* v. *Sindermann*, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700,
33 L.ED.2d 570(1970)..................................................................................................................25

*Schatten* v. *United States*, 419 F.2d 187, 191 (CA6 1969)........................................................18

*Service* v. *Dulles*, 354 U.S. 363 (1957)....................................................................17, 18, 23, 30

*Shidakur* v. *Carlin*, 782 F.2d 746, 751-52..................................................................................23

-iv-

*Switchmen's Union* v. *National Mediation Board*, 320 U.S. 297................................................19

*Tutun* v. *United States*, 270 U.S. 568, 576, 577.........................................................................19

*United States* v. *Abilene & Southern Ry. Co.*, 265 U.S. 274, 288, 44 S. Ct. 565, 68 L. Ed. 1016, 1023 (1924).........................................................................................................19

*United States* v. *Caceres*, 440 U.S. 741(1979).............................................................17, 18, 23

*United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S.260 (1954)...........17, 18, 19, 21, 24, 29, 30

*United States ex rel. Brooks* v. *Clifford*, 409 F.2 at 706 (4thCir.1969)........................................30

*United States* v. *Heffner*, 420 F.2d 809, 811-812(4th Cir.1969)..........................................18, 29

*United States* v. *Leahey*, 434 F.2d 7, 9 (CA1 1970)..................................................................18

*United States* v. *Lloyd*, 431 F.2d 160, 171 (CA9 1970).............................................................18

*United States* v. *Nixon*, 418 U.S. 683, 695-696 (1974).............................................................17

*United States* v. *Sourapas*, 515 F.2d 295, 298 (CA9 1975).......................................................18

*Vanover* v. *Hantman et. al.*, 77 F.Supp.2d 91(1999)............................................................*passim*

*Vitarelli* v. *Seaton*, 359 U.S. 535 (1959)..........................................................................17, 18, 30

*Waldron* v. *I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993),*cert. denied*, 513 U.S. 1014, 130 L. Ed. 2d 489, 115 S. Ct. 572 (1994)..........................................................................................23

*Washington* y. *Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772(1997)..........................................................................................................................32

*Westmoreland* v. *Laird*, 364 F.Supp 948 (1973)..................................................................9, 29

*Yellin* v. *United States*, 374 U.S. 109 (1963)............................................................................17

## STATUTES

2 U.S.C. 60-1(a)(1)..................................................................................6, 9, 14, 27, 32, 34

2 U.S.C. 60-1(a)(2)..................................................................................6, 9, 14, 27, 32, 34

2 U.S.C. 60-1(b).......................................................................................6, 9, 14, 27, 32, 34

2 U.S.C. 1831............................................................................................6, 8, 14, 27, 31, 34

2 U.S.C. 1831(c)(1) formerly 40 U.S.C. 166b-7(c)(1)...................................................................10

2 U.S.C. 1831(c)(2), formerly 40 U.S.C. 166b-7(c)(2).................................................................11

2 U.S.C. 1831(c)(2)(F), formerly 40 U.S.C. 166b-7(c)(2)(F)................................ 8, 11, 20, 21, 31

2 U.S.C. 1831(c)(2)(H), formerly 40 U.S.C. 166b-7(c)(2)(H).......................................................9

2 U.S.C. 1831(d)..................................................................................................1, 14, 20, 32

2 U.S.C. 1831(d)(2)..................................................................................................................10

5 U.S.C. 553, formerly Section 7 (d) of the Administrative Procedure Act of 1946,
5 U.S.C. 1006............................................................................................................................16

5 U.S.C. 701(b)(1)(A)..............................................................................................................18

5 U.S.C. 7501 *et seq.*..............................................................................................................31

## REGULATIONS

1994 Architect of the Capitol's Personnel Manual, Chapter 752 -Discipline,"
"1994 Amended Chapter 752,".........................................................................................*passim*

2000 Architect of the Capitol's Interim Personnel Manual Chapter 630-I,
Absence and Leave," "Interim Chapter 630"................................................................3, 4, 9, 33

5 C.F.R. 752.101 *et. seq.*..........................................................................................................31

## TREATISES

Benjamin, *Administrative Adjudication in New York*, 207 (1942)..........................................15, 17

2 N. Singer, *Sutherland Statutory Construction*, Section 4.18 at 174
(4th. ed. 1985)...........................................................................................................................28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT SOLOMON,

     Plaintiff,

v.                             Civil Action No.: 06-2214(RCL)

OFFICE OF THE ARCHITECT OF THE CAPITOL, *et. al.*,

     Defendant.

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, by his counsel, timely presents herewith his Memorandum of Law in Support of his Opposition to Defendant's Motion to Dismiss.

## I. INTRODUCTION

Plaintiff contends that the due process "notice and opportunity to be heard" procedures provided Plaintiff by the "July 15, 1994 Architect of the Capitol's Personnel Manual, Chapter 752 -Discipline," "1994 Amended Chapter 752," formal statutory regulations duly promulgated pursuant to 2 U.S.C. 1831(d) of the Architect of the Capitol's Human Resources Act, "HRA," provided Plaintiff with a Fifth Amendment due process property interest in his employment with the Office of the Architect of the Capitol, "Office of the AOC." Please note Plaintiff's inclusion of the cover page to said 1994 Amended Chapter 752 omitted by Defendants hereto. See Exhibit 1. The very same procedures in the 1994 Amended Chapter 752 were in use in 2003 and used as the disciplinary procedures for the termination of Plaintiff from his due process property interest in employment with Defendant Office of the AOC.

Plaintiff contends that said due process "notice and opportunity to be heard" procedures required providing Plaintiff with a copy of the Hearing Officer's decision contemporaneous with its production and forwarding to the former Chief Operating Officer, Defendant McSeveney and

former Architect of the Capitol, Defendant Hantman; a procedure recognized by the Court in *Vanover* v. *Hantman, et. al.,* 77 F.Supp. 2d 91(D.D.C. 1999), as being part and parcel of the undisputed procedures identified and rendered to Mr. Vanover pursuant to said 1994 Amended Chapter 752 pursuant to the Court's determination that Mr. Vanover had received all the due process he was due.

Plaintiff contends that Defendants deprived Plaintiff of his Fifth Amendment due process property interest in employment by refusing to provide Plaintiff with a contemporaneous copy of the Hearing Officer's decision pursuant to the 1994 Amended Chapter 752 termination hearing conducted which was used in support of terminating Plaintiff from said his Fifth Amendment due process property interest in employment with the Office of the AOC by former Chief Operating Officer and former Architect of the Capitol, Defendant McSeveney and Defendant Hantman, respectively.

Plaintiff further contends that the Defendants named in their personal capacities are not entitled to a qualified immunity.

Plaintiff, in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, presents matters outside the pleadings in support of Plaintiff's Opposition to Defendants' Motion to Dismiss.

## II. FACTUAL BACKGROUND

Plaintiff on June 9, 2003, June 10, 2003 and June 11, 2003 had been employed with the United States Senate Restaurants, a division of the Office of the AOC and had been so since 1986. See Exhibits 2 and 3 and Paragraph 2 of Plaintiff's Declaration.

Plaintiff, as a result of illness, was absent from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003. (Paragraph 3 of Plaintiff's Declaration.) Plaintiff had a positive sick leave balance on June 9, 2003 - June 11, 2003 and was not on leave restriction on said dates. See Exhibits

2

2, 3 and 4 and Paragraphs 4 and 5 of Plaintiff's Declaration.

Plaintiff, pursuant to and in accordance with the administrative requirements, terms, conditions and privileges of employment set forth in the "Architect of the Capitol's Interim Personnel Manual Chapter 630-I, Absence and Leave" policy, "Interim Chapter 630," provided Respondent with the appropriate documentation supporting his absence from the workplace on June 9, 2003 - June 11, 2003. See Exhibit 5 and Paragraph 6 of Plaintiff's Declaration.

On June 16, 2003, Plaintiff met with his supervisor, Defendant Savidge, Manager, Capitol Building, United States Senate Restaurants, to obtain approval for his absences from the workplace on June 9, 2003 - June 11, 2003. Absent said approval, Plaintiff would be placed in an AWOL status, a status subjecting Plaintiff to discipline. See Paragraph 6 of Plaintiff's Declaration.

On June 16, 2003, Plaintiff was advised by Defendant Manager Savidge that the administrative documentation provided by Plaintiff in accordance with said Interim Chapter 630 was insufficient. See Paragraph 7 of Plaintiff's Declaration.

Defendant Manager Savidge, in violation of Interim Chapter 630, demanded Plaintiff additionally provide a medical diagnosis in support of Plaintiff's absences on said dates of June 9, 2003 - June 11, 2003. See Paragraph 9 and 10 of Plaintiff's Declaration.

Said demand for a medical diagnosis was contrary to the administrative requirements established by Interim Chapter 630 and altered the, terms, conditions and privileges of Plaintiff's employment. See Paragraph 11 of Plaintiff's Declaration.

Plaintiff vigorously protested Defendant Manager Savidge's refusal to approve Plaintiff's absences pursuant to Plaintiff's refusal to provide the medical diagnosis demanded in violation of the established Interim Chapter 630. See Paragraph 12 of Plaintiff's Declaration.

Defendant Manager Savidge Plaintiff, pursuant to his illegal demands in violation of Interim

3

Chapter 630, placed Plaintiff in an AWOL status for said absences from the workplace. See Exhibit 4 and Paragraphs 8, 13, and 14 of Plaintiff's Declaration.

Plaintiff as a result of his vigorous protestation of Defendant Savidge's demand for a medical diagnosis on June 16, 2003, was placed on administrative leave by June 16, 2003 letter of Defendant Tiscione, Director, Human Resources Management Division, "HRMD," "...pending the outcome of an investigation concerning your involvement in an incident which occurred on June 16, 2003, in the office of Mr. Robert Savidge, Manger, Capitol Building,..." See Exhibit 6 and Paragraph 15 of Plaintiff's Declaration. Plaintiff at no time was interviewed pursuant to the alleged investigation of Defendant Tiscione and the HRMD. See Exhibit 6 and Paragraph 16 of Plaintiff's Declaration.

Plaintiff, to remove his placement in an AWOL for his absences, acceded to the unlawful demand of Defendant Manager Savidge, provided the unlawful medical diagnosis in support of his absences on June 9, 2003 - June 11, 2003. See Exhibit 7 and Paragraph 17 of Plaintiff's Declaration.

By letter of August 6, 2003, Defendant Manager Savidge, Plaintiff's first line supervisor, proposed the termination of Plaintiff from his due process property interest in employment pursuant to the "1994 Amended Architect of the Capitol's Personnel Manual Chapter 752 - Discipline," "1994 Amended Chapter 752," based on "exhibiting hostile and threatening behavior in the workplace. This conduct violates Sections 5.0 and 5.1 of the Office of the Architect policy, "Standards of Conduct," dated May 11, 1989, and the Architect of the Capitol's Memorandum of March 19, 1996, "Violence in the Workplace." See Exhibit 8 and Paragraphs 18 and 19 of Plaintiff's Declaration.

Plaintiff, by letter of August 20, 2003 to his second line supervisor, Defendant Marinaccio, Director of Food Services, United States Senate Restaurants, responded to the August 6, 2003, Proposal to Terminate of Defendant Manager Savidge. See Exhibit 9 and Paragraph 20 of Plaintiff's Declaration.

4

Defendant Director Marinaccio, by letter of September 15, 2003, concurred with Defendant Savidge's Proposal to Terminate the Plaintiff. See Exhibit 10 and Paragraph 21 of Plaintiff's Declaration.

Plaintiff requested a 1994 Amended Chapter 752 termination hearing and was provided by Defendant Human Relations Specialist Walker with an unauthorized "statement" in an unauthorized "booklet" of unknown authorship, origin and date of publication describing said 1994 Amended Chapter 752 proceeding. See Exhibit 11 and Paragraphs 22 and 23 of Plaintiff's Declaration.

Plaintiff was advised by said "statement" that he was not entitled to a copy of the decision of the Hearing Officer rendered pursuant to a Chapter 752 termination hearing. See Exhibit 11.

This was in conflict with and contrary to the notice and opportunity to be heard due process procedures provided in the 1994 Amended Chapter 752 policy and contrary to the Fifth Amendment due process property interest in employment determined by the Court in *Vanover* v. *Hantman*, 77 F.Supp.2d 91(D.D.C. 1999), "*Vanover*." See Exhibit 1.

Defendant Walker further provided Plaintiff with a copy of the allegations and material to be used against Plaintiff in the 1994 Amended Chapter 752 termination hearing.

A 1994 Amended Chapter 752 termination hearing was conducted pursuant to Plaintiff's request for same. See Paragraph 24 of Plaintiff's Declaration.

At said hearing Plaintiff requested that the Hearing Officer engaged to conduct said hearing pursuant to contract with the Office of the AOC provide him with a copy of her decision of the Hearing Officer when it was rendered to Defendant McSeveney and Defendant Hantman. See Paragraph 29 of Plaintiff's Declaration.

The Hearing Officer advised Plaintiff that he was not entitled to a copy of said decision. See Paragraph 29 of Plaintiff's Declaration.

5

Plaintiff was further advised by the Hearing Officer that the Office of the AOC had the burden of proof and the standard of proof was the "preponderance of evidence." See Paragraph 28 of Plaintiff's Declaration.

Defendant Employment Specialist Walker and Defendant Counsel Martinez represented the Office of the AOC at said termination hearing.

Plaintiff was represented by the same counsel who had represented two former employees at their termination hearing pursuant to which and in accordance with the due process procedures of notice and opportunity to be heard had been provided respective copies of the decision of the Hearing Officer when said decisions were rendered to Defendant Architect Hantman. See Paragraphs 25, 26 and 27 of Plaintiff's Declaration.

Plaintiff, pursuant to his request, was provided a tape recording copy of the hearing subsequent to the conclusion of the termination hearing.

Plaintiff was neither provided a copy of the decision of the Hearing Officer nor notice of when the decision of the Hearing Officer was rendered to the Office of the AOC.

Defendant Tiscione, Director of the Human Resources Management Division and Chief Administrative Officer in Defendant Office of the AOC, with full knowledge that the "statement" pursuant to which Plaintiff was refused a copy of the Hearing Officer's decision was contrary to the due process principles and procedures provided the Plaintiff in the 1994 Amended Chapter 752; knew said "statement" was unauthorized as Defendant Architect is the sole officer in Defendant Office of the AOC with authority to promulgate regulations pursuant to 2 U.S.C. 60-1(a)(1) and 2 U.S.C. 60-1(a)(2) and 2 U.S.C. 60-1(b) and 2 U.S.C. 1831.

Defendant Tiscione, Director of the Human Resources Management Division in Defendant Office of the AOC and Chief Administrative Officer in Defendant Office of the AOC, forwarded

the decision of the Hearing Officer to Defendant McSeveney and Defendant Architect of the Capitol absent disclosure to the Plaintiff and thereby placed her imprimatur as the Chief Administrative Officer in Defendant AOC on the substantive and procedural due process constitutional violations reflected in Defendants' refusing to provide said Hearing Officer's decision to the Plaintiff.

Plaintiff, by letter of December 22, 2003, received by Plaintiff on December 30, 2003, was terminated effective December 29, 2003, from his due process property interest in employment with the Office of the AOC. See Exhibit 12 and Paragraph 31 of Plaintiff's Declaration.

Thereafter, Plaintiff again requested and was refused a copy of the decision of the Hearing Officer. He was advised that the decision of the Hearing Officer was an "internal management document and is not available for disclosure." See Exhibit 13 and Paragraphs 31 and 32 of Plaintiff's Declaration.

Plaintiff solicited the help Senator Mikulski and Congressman Van Hollen to obtain a copy of the decision of the Hearing Officer. Pursuant to their respective efforts, Plaintiff, Senator Mikulski and Congressman Van Hollen were advised by Defendant Architect Hantman that the decision of the Hearing Officer was "an internal management document and not available for disclosure." See Paragraphs 31 and 32 of Plaintiff's Declaration.

### III. ARGUMENT

### A. CONSTITUTIONAL DUE PROCESS REQUIREMENTS

"Constitutionally adequate process must include notice and "some form of hearing," as the government "may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434, 71 L. Ed. 2d 265, 102 S. Ct. 1148 (1982). With regard to a termination of a protected interest in employment, due process requires a notice and a pretermination hearing allowing the employee

7

to challenge the grounds of the termination. See *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 542-43, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985)....More specifically, "the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. Id. at 546." *Vanover, supra*, at 104.

Plaintiff submits that the "explanation of the employer's evidence, and an opportunity to present his side of the story" provided a tenured employee *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 546(1985) includes providing the Plaintiff herein with a contemporaneous copy of the Hearing Officer's decision used by Defendant McSeveney and Defendant Hantman in support of terminating the Plaintiff and a complete record of the proceedings pursuant to the basic legal principal of the "exclusiveness of the record" which necessarily bars the use of the Hearing Officer's decision absent disclosure to the Plaintiff herein as set forth in Part 2 of Section C of the herein.

### B. BACKGROUND AND CONTEXT OF PLAINTIFF'S CONSTITUTIONAL DUE PROCESS PROPERTY INTEREST IN EMPLOYMENT AS APPLIED TO THE OFFICE OF THE ARCHITECT OF THE CAPITOL

Congress, in July 1994, pursuant to an audit of the Office of the AOC by the General Accounting Office, "GAO," uncovering unfettered discretionary abuses respecting administrative personnel practices absent employee protections, enacted the Architect of the Capitol's Human Resource Act, 2 U.S.C. 1831, (formerly 40 U.S.C. 166b-7), the "HRA."

The regulations implemented by former Architect White were designed as safeguards, a mandated outgrowth of the HRA, were promulgated to confer employee procedural protections to counter the discretionary abuses uncovered by the audit and investigation by GA.

Said regulations provided the substantive and procedural basis for the termination of the Plaintiff herein and were mandated by 2 U.S.C. 1831(c)(2)(F).

8

Said 1994 Amended Chapter 752, statutory regulations, have the force and effect of law. An administrative regulation promulgated within the authority granted by statute has the force of law and will be given full effect by the courts, and a violation of a valid administrative regulation, even by the authority promulgating same, constitutes in legal effect a violation of the statute. *Westmoreland* v. *Laird*, 364 F.Supp 948 (1973).

The HRA mandated the establishment of a modern personnel system. The modern personnel management system established by the Civil Service law for the Executive Branch of the Federal Government, by reason of the doctrine of the separation of powers, precluded an employee of the instant Congressional instrumentality, from the regulatory enforcement scheme provided the Executive Branch employees of the Federal Civil Service.

Until enactment of the HRA and promulgation of the 1994 Amended Chapter 752, the Architect of the Capitol, an officer of the United States, had unqualified discretionary power to discipline and terminate employees of said Congressional instrumentality pursuant to 2 U.S.C. 60-1(a)(1) and 2 U.S.C. 60-1(a)(2) and 2 U.S.C. 60-1(b).

The legal effect in implementing said 1994 Amended Chapter 752 policy was to restrict the formerly unqualified discretionary authority of the Architect of the Capitol to discipline and terminate an employee. The Architect was now required to act in accordance with the due process parameters and procedures of "notice" and "opportunity to be heard" in addition to providing that discipline was to be for only for cause and the efficiency of the service and for violation of relevant statutes and regulations necessarily mandating that an employee could **only** be placed in an AWOL status and disciplined therefor pursuant to violations **only** recognized as violations by the Interim Chapter 630, the uniform leave policy made applicable to all jurisdictions in the Office of the AOC pursuant to the mandate and authority of the Architect set forth in 2 U.S.C. 1831(c)(2)(H) of the

9

Human Resources Act.

In accordance with 2 U.S.C. 1831(d)(2) the Architect's 1994 Amended Chapter 752 was submitted to Speaker of the House, the House Office Building Commission, the Committee on Rules and Administration of the Senate and the Joint Committee on the Library for evaluation, monitoring and oversight.

### C. ANALYSIS OF *VANOVER* V. *HANTMAN*, 77 F.SUPP.2D 91(D.D.C. 1999), PLAINTIFF'S PROPERTY INTEREST IN EMPLOYMENT; AND DEFENDANTS' DENYING PLAINTIFF A COPY OF THE HEARING OFFICER'S DECISION

#### 1. WHETHER PLAINTIFF HAS A PROPERTY INTEREST IN EMPLOYMENT

The Court in *Vanover* v. *Hantman et. al.*, 77 F.Supp.2d 91(1999) determined that Plaintiff, pursuant to the 1994 Amended Chapter 752, "had a property interest in his employment" but had "received all the process that was due."*Id.* at 101.

Plaintiff Vanover had been provided with adequate notice, provided with opportunity to respond to the proposal and the concurring letter, provided with the evidence supporting the action, provided with a full hearing at which he was represented by counsel and had opportunity to confront the witness against him, provided with an opportunity to make a subsequent written argument to the hearing officer, and provided with a final appeal to the AC. As a whole, this process gave plaintiff a fair and more than adequate opportunity to hear the charges against him and present his side of the story." *Id.* at 109. Plaintiff Vanover and Plaintiff Commeree, in *Commeree* v. *Hantman et. al*, 1999 WL 1611325 (D.D.C. 1999), had been provided copies of the Hearing Officer's decision pursuant to the 1994 Amended Chapter 752 conducted on their respective Proposals to Terminate.

The Court in *Vanover* recognized that "[T]he HRA, passed in 1994, mandates that "the Architect of the Capitol shall establish and maintain a personnel management system." 40 U.S.C. 166b-7(c)(1). The law also specifies eight requirements that the system must satisfy, id.,

166b-7(c)(2), including "[a] fair and equitable system to address unacceptable conduct and performance by Architect of the Capitol employees, including a general statement of violations, sanctions, and procedures which shall be made known to all employees, and a formal grievance procedure." Id., 40 U.S.C. 66b-7(c)(2)(F)...." The HRA also provides deadlines for the development and implementation of the plan. Id. 166b-7(d)." *Vanover, supra,* Footnote 7 at 101.

The Court in *Vanover,* in recognizing Plaintiff's property interest in employment, identified *Board of Regents of State Colleges* v. *Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972), "as the seminal case on this issue." *Id.* at 101. "In Board of Regents, the court stated that to have a property interest in a benefit, a person "must have more than a unilateral expectation of it." Id. at 577. He must, instead, have "a legitimate claim of entitlement to it" created and defined "by existing rules or understandings that stem from an independent source such as state law." *Id.* These rules or understandings must provide the person with "an objectively reasonable expectation that he is entitled to retain [his employment.]" *Hall* v. *Ford,* 272 U.S. App. D.C. 301, 856 F.2d 255, 266 (D.C. Cir. 1988)." *Id.* at 101.

The Court in *Vanover* further stated that "[I]t is established that a legitimate expectation of continued employment can be created by both "rules" (statutes or regulations) or "understandings" (express or implied contracts). See *Hall* v. *Ford,* 272 U.S. App. D.C. 301, 856 F.2d 255, 265 (D.C. Cir. 1988). Thus, statements in employee handbooks and manuals can create a property interest in continued employment. See *Doe* v. *Gates,* 299 U.S. App. D.C. 114, 981 F.2d 1316, 1320 (D.C. Cir. 1993); see also *Ashton* v. *Civiletti,* 198 U.S. App. D.C. 190, 613 F.2d 923, 928 (D.C. Cir. 1980) (holding that while FBI employees did not have statutory civil service protections, "those facts do not prevent the Bureau from giving its employees some security in their jobs" and finding that statements in FBI manual established property right)." *Id.* at 102.

"Of course, the language involved must be sufficient to create an "objectively reasonable" expectation that an employee will be terminated only for certain causes. The D.C. Circuit has previously found that an employee who could be dismissed only for "such cause as will promote the efficiency of the service" enjoyed an entitlement to his job. See *Griffith* v. *Federal Labor Relations Authority*, 268 U.S. App. D.C. 491, 842 F.2d 487, 498 (D.C. Cir. 1988) (citing *Johnson* v. *United States*, 202 U.S. App. D.C. 187, 628 F.2d 187 (D.C. Cir. 1980)). In this case, Chapter 752 states that one of the policies of the OAC is to "ensure that disciplinary actions are taken only for such cause as will promote the efficiency of the Office under fair, orderly, and uniform procedures for effecting actions which are warranted on their merits." Pl. App. D at P 1.2.5. This language, albeit expressed as a policy rather than an expressed rule, is almost identical to that which the D.C. Circuit has previously found to create a property interest." *Id.* at 102.

The Court in *Vanover* indicated that "...in numerous places throughout the disciplinary action procedure, defendants are required to specify the existence of a cause for the disciplinary action. See, e.g., Pl. App. D at Appendix B.1.2 (stating that proposing officer "shall...provide...evidence of the problem(s) or incident(s).... The charge(s) must be supported by warnings previously issued, continued violations on which previous action(s) was taken, or specific evidence if the action is the first disciplinary action proposed.").... The Court has no difficulty finding that the policy and implementing procedures of Chapter 752 gave plaintiff an objectively reasonable expectation that he would be terminated only for cause and that plaintiff thus had a protected property right in his employment. *Id.* at 102-03.

## 2. WHETHER PLAINTIFF RECEIVED DUE PROCESS

The crucial question is whether the refusal to provide Plaintiff with a copy of what has become the "secret Hearing Officer's decision," pursuant to the unauthorized "statement" in an

unauthorized "booklet" of unknown origin and unknown date of publication, constitutes substantial substantive and procedural due process violation of Plaintiff's due process property interest in employment established by the 1994 Amended Chapter 752 as determined by the *Vanover* Court.

Plaintiff contends that pursuant to Defendants' refusal to provide him with a copy of the Hearing Officer's decision, he was denied the opportunity to review the Hearing Officer's decision and thereby denied the opportunity to make a subsequent written argument to Defendant McSeveney and Defendant Hantman respecting the contents of the Hearing Officer's decision and thereby denied his due process opportunity to be heard pursuant to the termination hearing conducted pursuant to the 1994 Amended Chapter 752.

Plaintiff, in the instant action, was provided with adequate notice and an opportunity to respond to the proposal to terminate. Pursuant to the concurring letter to terminate and request for a termination hearing Plaintiff was provided with the evidence to be used support the termination action. He was provided with a hearing at which he was represented by counsel and had opportunity to confront the witnesses against him.

Plaintiff, however, at the conclusion of the hearing, was denied a copy of the Hearing Officer's decision in violation of the due process procedures duly established by the 1994 Amended Chapter 752 and determined by the *Vanover* Court as providing Plaintiff with a Fifth Amendment due process property interest in employment.

Plaintiff was denied a copy of the Hearing Officer's decision pursuant to an unauthorized "statement" in an unauthorized "booklet" of unknown provenance and unidentified origin which . advised Plaintiff that he was not entitled to a copy of the Hearing Officer's decision.

Said unauthorized "statement" was created subsequent to the determination of the Court in *Vanover* v. *Hantman*, 77 F.Supp. 2d 91(D.D.C. 1991). Plaintiff submits that said "statement and

13

booklet" was created to counter the *Vanover* decision wherein it was determined that employees of the Office of the AOC were provided a due process property interest in employment.

Said unauthorized "statement" in an unauthorized "booklet" of unknown origin was at no time acknowledged by Defendant Architect Hantman as being an amendment to the 1994 Amended Chapter 752 or provided to the Speaker of the House, the House Office Building Commission, the Committee on Rules and Administration of the Senate and the Joint Committee on the Library for evaluation, monitoring and oversight in accordance with 2 U.S.C. 1831(d) of the HRA.

Said unauthorized "statement" was not acknowledge as substituting for the due process procedures provided in the 1994 Amended Chapter 752 and recognized by the *Vanover* Court. As the Plaintiff herein was a co-worker and friend of Mr. Vanover in the Senate Restaurants and knew of Mr. Vanover's receipt of a copy of the Hearing Officer's decision pursuant to Mr. Vanover's termination hearing conducted pursuant to the 1994 Amended Chapter 752, Plaintiff accordingly had the reasonable expectation of receiving said decision of the Hearing Officer in accordance with the due process property interest provided by the 1994 Amended Chapter 752 as determined by the *Vanover* Court. Moreover, Plaintiff's counsel herein had represented said former employees, Commeree and Vanover, who had both received the decision of the Hearing Officer pursuant to their respective 1994 Amended Chapter 752 termination hearings.

Said unauthorized "statement" was not promulgated pursuant to 2 U.S.C. 60-1(a)(1), 2 U.S.C. 60-1(a)(2), 2 U.S.C. 60-1(b) and 2 U.S.C. 1831..

Said unauthorized "statement" simply "appeared" pursuant to Plaintiff's request for a due process hearing on his Proposal to Terminate.

Moreover, Defendant McSeveney, by his "final decision" of December 22, 2003, advised Plaintiff that said secret decision of the Hearing Officer was used as a basis and support for

14

terminating the Plaintiff.

The Court in *Mazza* v. *Cavicchia*, 15 N.J. 498, 105 A.2d 545(1954), "*Mazza*," pursuant to the basic principle of the "exclusiveness of the record," determined that the use by the deciding official of a hearing officer's decision absent disclosure of the decision to the appellant therein, made a sham of the right to a hearing, "the right to a hearing itself becomes meaningless." The Court determined that the principle of the exclusiveness of the record necessarily barred the use of the hearer's report, (which is conceded by Defendant McSeveney to have been submitted to him with the record without disclosure to the Plaintiff herein), as an aid in the administrative decision process. The Court further stated that

"In any proceeding that is judicial in nature,  whether in a court or in an administrative agency, the process of decision must be governed by the basic principle of the exclusiveness of the record. "Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing." Benjamin, *Administrative Adjudication in New York*, 207 (1942). Unless this principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who decides the case may stray at will from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations or even hold conferences with him? Id. at 514.

The *Mazza* Court, citing *Pennsylvania R. Co.* v. *New Jersey State Aviation Commission*, 2 N.J. 64, 72. stated that "The action taken cannot be made to rest upon undisclosed evidence or information dehors the record which the parties in interest have had no opportunity to test for trustworthiness and explain or rebut." *Id.* at 514-15.

"The principle of the exclusiveness of the record necessarily bars the use of the hearer's report (which it is conceded in the instant case was submitted to the respondent Director with the record without disclosure thereof to the appellant) as an aid in the administrative decision process Unless it is made part of the record. As the noted Benjamin Report on *Administrative Adjudication in New York* puts it, "whatever actually plays a part in the decision should be known to the parties, and subject to being controverted" (at p. 208). The hearer's report obviously played a part in the decision in this case. For it to have played such a part without having been shown to the appellant clearly violates his right to have the decision based exclusively upon matters in the record, which are known to him and can consequently be controverted by him. The individual litigant is entitled

to be apprised of the materials upon which the agency is acting. He has a right not only to refute but, what in a case like this is usually more important, to supplement, explain, and give different perspective to the hearer's view of the case...." *Id.* at 515.

"The hearer may have drawn some erroneous conclusion in his report, or he may even have made some factual blunders. Such mistakes are not uncommon in both judicial and administrative proceedings; indeed, the whole process of judicial review in both fields is designed to guard against them. But if a party has no knowledge of the secret report or access to it, how is he to protect himself? An unjust decision may very likely be the result where no opportunity is given to those affected to call attention to such mistakes. That is why it is a fundamental principle of all adjudication, judicial and administrative alike, that the mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert. In the instant case the hearer can be characterized as a "witness" giving his evidence to the judge behind the back of the appellant, who has no way of knowing what has been reported to the judge. Indeed, at one stage of the agency's history, if not now, it was the practice for the Commissioner to confer with the hearer regarding the facts or the conduct of the hearing. Such conduct not only constitutes a violation of the principle of the exclusiveness of the record in deciding controversies, but it shocks one's sense of fair play on which our fundamental concepts of procedure are based." *Id.* at 515-516

Plaintiff submits that Congress recognized said basic principle of the "exclusiveness of the record," as a fundamental of due process, when it provided said basic principle with a statutory basis. Section 7 (d) of the Administrative Procedure Act of 1946, 5 U.S.C. 1006 stated that "[T]he transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision..." (Said principle is now codified in 5 U.S.C. 553). The *Mazza* Court further noted that "[T]he principle of the exclusiveness of the record is too well established in American administrative law to admit of real dispute." *Id.* at 516.

The *Mazza* Court stated that this "indicate[d] the desire of Congress to maintain the disclosure of examiner's reports as the basic feature of the process of federal administrative decision. Without that feature the use of a hearer's report is like a performance of Hamlet without the Prince of Denmark. `It is a distinguishing feature of the examiner report procedure that the hearing officer's report is subjected, before the deciding body acts upon it, to exception and critical argument (oral and written) by the parties, calculated to correct whatever errors the report may

contain. This is a feature of the greatest value not only in assuring a correct result but in satisfying the feelings of the parties.' Benjamin, *supra*, 231. As Chief Justice Hughes put it in Second Morgan case, supra, 304 U.S., at page 22, 58 S. Ct., at page 778, 82 L. Ed. 1129: `The maintenance of proper standards on the part of administrative agencies in the performance of their quasi-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest.'" *Id.* at 524.

The *Vanover* Court had reservations respecting the long line of cases beginning with *Bridges v. Wixon*, 326 U.S. 135, 152-153 (1945), wherein the Supreme Court held that "one under investigation... is legally entitled to insist upon the observance of rules" promulgated by an executive or legislative body for his protection. See *United States* v. *Nixon*, 418 U.S. 683, 695-696 (1974); *Morton* v. *Ruiz*, 415 U.S. 199, 235 (1974); *Yellin* v. *United States*, 374 U.S. 109 (1963); *Vitarelli* v. *Seaton*, 359 U.S. 535 (1959); *Service* v. *Dulles*, 354 U.S. 363 (1957); *United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S. 260 (1954). Justice Frankfurter, in his dissent in *United States* v. *Caceres*, 440 U.S. 741, 758(1979), finding the concept of due process underlying the aforementioned decisions, stated that "government officials no less than private citizens are bound by rules of law." Further, "[W]here individual interests are implicated, the Due Process Clause requires that an executive agency adhere to the standards by which it professes its action to be judged. See *Vitarelli* v. *Seaton, supra*, at 547 (Frankfurter, J., concurring in part and dissenting in part)." *Caceres, supra* at 758.

The *Vanover* Court, defining said cases as "administrative law cases finding their source in the Administrative Procedures Act, was concerned with the applicability of said cases to the Office of the AOC as the "[C]ourts have often relied upon the [Administrative Procedures Act] as the source of what has become the *Accardi* doctrine. See Fausto, 1997 WL 540809 *9. If the *Accardi*

doctrine is based upon the right of administrative review found in the APA, then it cannot be

applicable to the OAC, which is not subject to the APA's provisions. See 5 U.S.C. 701(b)(1)(A)."

*Vanover, supra* at 107.

Justice Marshall and Justice Brennan in their dissent in United States v. Caceres, 440 U.S.

741(1979) insisted however that the doctrine set forth in said decisions was predicated on the Due

Process Clause.

"[Although not always expressly predicated on the Due Process Clause, these decisions are explicable in no other terms. The complaints in only two of the cases, *Vitarelli* v. *Seaton*, 359 U.S. 535 (1959), and *Service* v. *Dulles*, 354 U.S. 363 (1957), invoked the Administrative Procedure Act, see ante, at 754 n. 19. In neither of these cases was the Act even mentioned in the Court's opinions. Rather, *Vitarelli* followed *Service*, see 359 U.S., at 539-540, which in turn had relied on *United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S. 260 (1954). See 354 U.S., at 373, 386-387. Both *Accardi* and its predecessor, *Bridges* v. *Wixon*, 326 U.S. 135 (1945), were habeas corpus cases. And *Yellin* v. *United States*, 374 U.S. 109 (1963), which involved criminal contempt sanctions, followed *Accardi*. Thus, it is clear that this line of precedent cannot be dismissed as federal administrative law. Cf. *Board of Curators, Univ. of Mo.* v. *Horowitz*, 435 U.S. 78, 92 n. 8 (1978) (dictum). To the contrary, these decisions have been uniformly, and I believe properly, interpreted as resting on due process foundations. See *United States* v. *Sourapas*, 515 F.2d 295, 298 (CA9 1975); *Konn* v. *Laird*, 460 F.2d 1318 (CA7 1972); *Antonuk* v. *United States*, 445 F.2d 592, 595 (CA6 1971); *Hollingsworth* v. *Balcom*, 441 F.2d 419, 421 (CA6 1971); *United States* v. *Leahey*, 434 F.2d 7, 9 (CA1 1970); *United States* v. *Lloyd*, 431 F.2d 160, 171 (CA9 1970); *Government of Canal Zone* v. *Brooks*, 427 F.2d 346, 347 (CA5 1970); *United States* v. *Heffner*, 420 F.2d 809, 811-812 (CA4 1969); cf. *Schatten* v. *United States*, 419 F.2d 187, 191 (CA6 1969)...." *Id. Caceres, supra*, Footnote 1 at 758.

The *Mazza* Court, however, observed that the Administrative Procedures Act, with respect

to the basic principle of the exclusiveness of the record, "was merely restating a principle that has

been uniformly applied by the federal courts in the absence of legislation. *Ohio Bell Telephone Co.*

v. *Public Utilities Commission*, 301 U.S. 292, 300, 57 S. Ct. 724, 81 L. Ed. 1093, 1099 (1937);

*United States* v. *Abilene & Southern Ry. Co.*, 265 U.S. 274, 288, 44 S. Ct. 565, 68 L. Ed. 1016,

1023 (1924); decisions well in advance of the promulgation of said Administrative Procedures Act.

The *Mazza* Court further observed, citing Chief Justice Hughes in *Morgan* v. *United States*,

18

304 U.S. 1, 20(1938) that "[T]he requirements of fairness are not exhausted in the taking or consideration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps."

Plaintiff submits that the *Vanover* Court's reservations are eliminated when viewed through the prism of the fundamental due process principle of the "exclusiveness of the record," a principle recognized and established and ingrained in our system of jurisprudence and Supreme Court case law well in advance of the Administrative Procedures Act and its inapplicability to the instant Congressional instrumentality.

Justice Frankfurter, in his concurrence in *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123(1951), stated his views respecting "fairness of procedure" and "due process."

"[This Court is not alone in recognizing that the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society. Regard for this principle has guided Congress and the Executive. Congress has often entrusted, as it may, protection of interests which it has created to administrative agencies rather than to the courts. But rarely has it authorized such agencies to act without those essential safeguards for fair judgment which in the course of centuries have come to be associated with due process. See *Switchmen's Union* v. *National Mediation Board*, 320 U.S. 297; *Tutun* v. *United States*, 270 U.S. 568, 576, 577; *Pennsylvania R. Co.* v. *Labor Board*, 261 U.S. 72. n15 And when Congress [\*169] has given an administrative agency discretion to determine its own procedure, the agency has rarely chosen to dispose of the rights of individuals without a hearing, however informal. n16" *Id.* at 168-69.

Accordingly, Plaintiff submits that he was entitled to a copy of the Hearing Officer's decision contemporaneous with its forwarding to Defendant McSeveney and Defendant Hantman. in accordance with 1994 Amended Chapter 752, the basic legal and due process principle of the exclusiveness of the record, the earlier and later Supreme Court case law set forth herein in support of same and the decision in *Vanover*.

### 3. *ACCARDI* REVIEW

Plaintiff submits that Defendants denying him a copy of the Hearing Officer's decision

19

denied him a constitutionally fair and adequate "opportunity to hear the charges against him and present his side of the story" pursuant to the notice and opportunity to be heard due process procedures provided by Defendant Office of the AOC and former Architect White and Congress pursuant to the 1994 Amended Chapter 752 pursuant to 2 U.S.C. 1831(c)(2)(F) and 2 U.S.C. 1831(d) of the Human Resources Act.

Plaintiff submits that pursuant to the basic principle of the "exclusiveness of the record," that the use by Defendant McSeveney and Defendant Architect Hantman of the Hearing Officer's decision absent disclosure of the decision to the Plaintiff herein, made a sham of Plaintiff's hearing and the due process notice and opportunity to be heard procedures provided Plaintiff pursuant to the 1994 Amended Chapter 752. As stated in *Mazza, supra*, absent disclosure to the Plaintiff, "the right to a hearing itself becomes meaningless."

Plaintiff submits that pursuant to the basic principle of the "exclusiveness of the record," which is conceded by Defendant McSeveney and Defendant Architect Hantman to have been submitted to them with the record without disclosure to the Plaintiff herein, Plaintiff was deprived of his due process notice and opportunity to be heard and his due process property interest in employment by his termination from employment with Defendant Office of the AOC.

Plaintiff submits that denying him a copy of the Hearing Officer's decision was a procedural and substantive error "so substantial and so likely to cause prejudice that no claimant can fairly be required to be subjected to adverse action under such a flawed proceeding...." *Vanover, supra* at 109.

Moreover, Plaintiff submits that Defendants, in depriving him of a contemporaneous copy of the decision of the Hearing Officer pursuant to the unauthorized "statement" of unknown provenance, were operating unlawfully in violation of the 1994 Amended Chapter 752 and 2

U.S.C.1831(c)(2)(F) and outside the scope of their employment and, pursuant to the *Vanover* Court, citing *Doe* v. *Gates*, 229 U.S. App. D.C. 114, 981 F.2d 1316, 1321(D.C.Cir. 1993), "when government employees offer assurances that conflict with federal law, they do no speak for the United States. *Vanover, supra* at 108.

Justice Frankfurter, in his concurrence in *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123(1951) observed that "[F]airness of procedure is `due process in the primary sense.' *Brinkerhoff-Faris Co.* v. *Hill*, 281 U.S. 673, 681. It is ingrained in our national traditions and is designed to maintain them." *Id.* at 161-62.

In his discussion of fairness, Justice Frankfurter stated that "[T]he heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. *Id* at 170, Footnote 17.

Justice Frankfurter repeated the three recognized principles of "natural justice" set forth in the Report of Committee on Ministers' Powers, Cmd. 4060, pp. 75-80: "A man may not be a judge in his own cause; no party ought to be condemned unheard; and, a party is entitled to know the reason for the decision." *Id* at 170, Footnote 17.

Plaintiff submits that Defendants' depriving him of a contemporaneous copy of the Hearing Officer's decision which was forwarded to Defendant McSeveney and Defendant Architect Hantman and used as a basis and support for the termination of Plaintiff was in violation of the due process principle and determinations discussed in the *Mazza* decision, the concurring opinion of Justice Frankfurter in *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123(1951) and the most recent decision of the *Vanover* Court which reiterating that pursuant "to the well-established *Accardi* doctrine that an agency must comply with its own regulations in effecting the removal of one of its

21

employees." *Vanover, supra* at 106.

Plaintiff submits that the procedure implemented to deprive Plaintiff of a contemporaneous copy of the Hearing Officer's decision which thereby deprived him of his opportunity to review and respond to the decision of the Hearing Officer was unlawfully and unconstitutionally implemented as previously discussed in Part 1 and Part 2 of Section "C" herein this Opposition. Moreover, as expressed in *Vanover*, citing *Doe* v. *Gates*, 981 F.2d 1316, 1321(D.C.Dir. 1993) "when government employees offer assurances that conflict with federal law, they do not speak for the United States. *Vanover, supra* at 108.

Plaintiff submits that the "procedure" depriving Plaintiff of a contemporaneous copy of the Hearing Officer's decision which thereby deprived him of his opportunity to review and respond to the decision of the Hearing Officer affected rights so substantively fundamental as to constitutionally void the termination of the Plaintiff. See *Mazaleski* v. *Treusdell*, 183 U.S. App. D.C. 182, 562 F.2d 701, 719 (D.C. Cir. 1977).

As stated by the *Vanover* Court "[W]e are unconcerned with whether, absent the [procedural error], Koenigs would have reached the same decision to demote Shidakur. The test is not whether the procedural defect caused actual prejudice to the rights of the party before the court. The test is an objective one, whether the particular procedural defect is so substantial and so likely to cause prejudice that no claimant can fairly be required to be subjected to adverse action under such a flawed proceeding. *Shidakur* v. *Carlin*, 782 F.2d 746, 751-52 (citations omitted). 9 Cf. *Waldron* v. *I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993)(holding that where Regulation does not affect `fundamental rights,' violation of the regulation does not render proceeding void unless there is `a showing of prejudice to the rights sought to be protected by the subject regulation.), *cert. denied*, 513 U.S. 1014, 130 L. Ed. 2d 489, 115 S. Ct. 572 (1994). The Court therefore proceeds with this

22

test of prejudice in mind." *Vanover, supra* at 106-07.

Justice Frankfurter, in his dissent in *United States* v. *Caceres*, 440 U.S. 741, 764(1979)

earlier dispensed with the a standard of prejudice with respect to measuring due process obligations.

"Implicit in these decisions, FN.7 and in the Due Process Clause itself, is the premise that regulations bind with equal force whether or not they are outcome determinative. As its very terms make manifest, the Due Process Clause is first and foremost a guarantor of process. It embodies a commitment to procedural regularity independent of result. To focus on the conduct of individual defendants rather than on that of the government necessarily qualifies this commitment. If prejudice becomes critical in measuring due process obligations, individual officials may simply dispense with whatever procedures are unlikely to prove dispositive in a given case. Thus, the majority's analysis invites the very kind of capricious and unfettered decisionmaking that the Due Process Clause in general and these regulations in particular were designed to prevent."

Justice Frankfurter, in his concurrence in *Joint Anti-Fascist Refugee Committee* v. *McGrath*,

341 U.S. 123,136(1951) further observed that "...[W]here an act of an official plainly falls outside

of the scope of his authority, he does not make that act legal by doing it and then invoking the

doctrine of administrative construction to cover it;" i.e. providing the unauthorized "statement" to

the Plaintiff as proof itself that the 1994 Amended Chapter 752 had been amended or that Plaintiff's

entitlement to the Hearing Officer's decision had been somehow abrogated by presenting Plaintiff

with said unauthorized "statement" of unknown provenance when it became not only necessary but

convenient to do so. "[W]hen the government engages to protect individual interests, it may not

constitutionally abrogate that commitment at its own convenience." Justice Frankfurter, in his

dissent in *United States* v. *Caceres*, 440 U.S. 741, 765(1979).

Where internal regulations do not merely facilitate internal agency housekeeping but rather

afford significant procedural protections, the Supreme Court has insisted on compliance. See

*American Farm Lines* v. *Black Ball Freight Service,* 397 U.S. 532, 538(1970).

The *Vanover* Court determined that the disciplinary procedures established in the 1994

Amended Chapter 752 Personnel Manual are the sort of binding procedural rights enforceable under

23

*Accardi*, and that the failure by an employer to follow its own procedures may render a discharge void. The *Vanover* Court cited the determination of the Court in *Larker* v. *Office of the AOC*, 1991 WL 153119 at *5(1991), a prior matter respecting Defendant Office of the AOC, in support of the application of the *Accardi* doctrine.

Plaintiff submits Defendants' violation of due process reflected in its refusal to provide Plaintiff with a copy of the decision of the Hearing Officer violated the due process provisions of the 1994 Amended Chapter 752 pursuant to which hearing was conducted and said decision was used in support of the termination of the Plaintiff. Plaintiff further submits that the use of the decision of the Hearing Officer absent disclosure to the Plaintiff renders the discharge void and in violation of the due process principle of the "exclusiveness of the record." Plaintiff further submits that he has presented sufficient evidence to support a claim under the *Accardi* doctrine.

The due process 1994 Amended Chapter 752 was implemented by former Architect White to comply with the Congressional intent of eliminating the discretionary abuses of power uncovered by the audit and investigation of the General Accounting Office. Defendants' refusal to provide Plaintiff with a copy of the decision of the Hearing Officer pursuant to his termination hearing pursuant to said statutory regulations promulgated in accordance with the HRA provides the Defendant Office of the AOC and the Defendants named in their personal capacities with the unqualified ability to return to the discretionary abuses intended to be eliminated by said HRA.

When the decision of the Hearing Officer and the findings of facts, conclusions of law and recommendations contained therein is rendered to the Chief Operating Officer and the Architect, Defendant McSeveney and Defendant Hantman respectively but is neither disclosed to the Plaintiff nor made a part of the record of the "hearing," doubt arises as to whether the Hearing Officer had an accurate view of the facts and/or whether a true view of the facts was conveyed to said respective

24

officials in accordance with the law made applicable to the Defendant instrumentality.

## D. DEFENDANTS NAMED IN THEIR PERSONAL CAPACITY FOR VIOLATION OF CONSTITUTIONAL DUE PROCESS PROPERTY INTEREST IN EMPLOYMENT ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The qualified immunity doctrine is an attempt to reconcile two important but conflicting concerns. On the one hand, "in situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 814 (1982) citing *Butz* v. *Economou* 438 U.S. 478, 506 (1978), and *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 410 (1984). On the other hand, such suits "frequently run against the innocent,"burdening officials and chilling the conscientious execution of their duties. *Harlow*, 457 U.S. at 814.

The assertion of qualified immunity triggers a three pronged inquiry: (1) whether the plaintiff's have asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, a reasonable official would have known that the official's conduct violated that right.

## 1. THE PLAINTIFF HAS ASSERTED A VIOLATION OF HIS DUE PROCESS PROPERTY INTEREST IN EMPLOYMENT AND PROPERTY INTEREST IN CONTINUED EMPLOYMENT

The Supreme Court has held that the constitutional guarantee of due process extends to protect property interest, broadly defined as the "interest that a person has already acquired, in specific benefits." *Board of Regents* v. *Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2709, 33 L.ED.2d 548 (1972). Property interests in employment are not themselves constitutionally created; rather, they are derived from independent sources, such as statutes, regulations, ordinances, or "existing rules or understandings...that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577, 92 S.Ct. at 2709; *Perry* v. *Sindermann*, 408 U.S. 593, 601-02, 92 S.Ct. 2694,

25

2699-2700, 33 L.ED.2d 570(1970). The rules and understandings on which an employee bases his Fifth Amendment claims, however, must create an "objectively reasonable expectation" of continued employment. *Hall* v. *Ford*, 856 F.2d 255, 266 (D.C.Cir.1988).

As hereinbefore stated in this Opposition, by statutory intention and design, the Architect's 1994 Amended Chapter 752 was a policy mandated by the Human Resource Act to be consistent with a modern personnel system which created the "objectively reasonable expectation" of continued employment through the due process rights and protections made available to the Plaintiff, an employee of Defendant the Office of the Architect of the Capitol, an instrumentality of the legislative branch of the Federal Government.

## 2. PLAINTIFF'S RIGHTS WERE CLEARLY ESTABLISHED AT THE TIME OF THE DEFENDANTS' CONDUCT

The Plaintiff, a public employee with a due process property interest in his continued employment pursuant to the 1994 Amended Chapter 752 statutory regulations, the legal authority for removing the Plaintiff from said employment, is provided with the fundamental due process procedures hereinafter set forth: (1) to be advised of the cause of the termination in sufficient detail to permit him to show any error that may exist and not for the efficiency of the service; (2) to be advised the names and nature of the testimony of the witnesses against him; (3) to be afforded a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) before a tribunal that possesses some expertise and an apparent impartiality toward the charges; (5) be provided with a copy of the decision of the Hearing Officer contemporaneous with forwarding the decision of the Hearing Officer to the Chief Operating Officer and the Architect of the Capitol, Defendant McSeveney and Defendant Architect Hantman.

The effect of refusing to provide Plaintiff with a copy of the decision of the Hearing Officer is to exclude the decision of the Hearing Officer from the administrative record of the termination

26

proceeding and to destroy the exclusiveness of the record making said decision of the Hearing Officer an ex parte communication thereby abrogating the Plaintiff's due process rights to a meaningful hearing by abrogating Plaintiff's right to review and rebut the findings and recommendations and conclusions of law made by said Hearing Officer.

The effect of refusing to provide Plaintiff with a copy of the decision of the Hearing Officer and excluding the decision of the Hearing Officer from the administrative record of the termination proceeding pursuant to an unauthorized "statement" of unknown provenance is to unlawfully amend the 1994 Amended Chapter 752 in violation of 2 U.S.C. 1381(d) and abrogate the due process property interest determined by the *Vanover* Court. Moreover, Defendant Hantman, as former Architect of the Capitol, had sole authority to amend the 1994 Amended Chapter 752 pursuant to 2 U.S.C. 60-1(a)(1), 2 U.S.C. 60-1(a)(2), 2 U.S.C. 60-(1)(b) and 2 U.S.C. 1831(d).

The effect of refusing to provide Plaintiff with a copy of the decision of the Hearing Officer and excluding the decision of the Hearing Officer from the administrative record of the termination proceeding pursuant to an unauthorized "statement" of unknown provenance is to enable Defendant Office of the AOC and defendants named in their personal capacities to return to the unqualified discretionary power and abuses intended by Congress by enactment of the Human Resources Act to be eliminated. Plaintiff's first line supervisor, Defendant Manager Savidge, becomes pursuant to his "Proposal to Terminate" the Plaintiff, the accuser, judge, and jury of the termination and removal of Plaintiff from his due process property interest in employment.

This is a corruption and abrogation of the "model personnel practices" mandated by Congress to be implemented by former Architect White pursuant to said Human Resources Act . The "enforcement" branch of Defendant Office of the AOC -- Defendant Manager Savidge, Defendant Director Marinaccio, Defendant Counsel Martinez, Defendant Director Tiscione,

27

Defendant Specialist Walker, Defendant Chief Operating Officer McSeveney and Defendant Architect Hantman -- in violation and abrogation of all objectively reasonable and clearly established due process rights provided by the 1994 Amended Chapter 752 as determined by the *Vanover* Court, is "judging itself." Moreover, the sub rosa and unlawful manipulation of the Human Resources Act and the 1994 Amended Chapter 752 remains hidden as the ones affected, the ones summarily terminated, are removed from employment.

It is clearly established law that the word "shall" is the language of command in a statute" *Association American Railroads* v. *Costle* 562 F.2d 1310, 1312 (D.C.Cir.1977). "While it is an established principle of administrative law that reviewing courts will generally "show great deference to the interpretation given a statute by the officers or agency charged with its administration this principle has no application where, as here, the agency has misinterpreted its statutory mandate." *Association American Railroads* v. *Costle* 562 F.2d 1310, 1318 (D.C.Cir.1977) Further, "...where the directions of a statute are mandatory, then strict compliance with the statutory terms is essential to the validity of the administrative actions." *Farrel Corp.* v *U.S. International Trade Commission*, 949 F.2d 1147 (Fed.Cir. 1991) quoting 2 N. Singer, *Sutherland Statutory Construction*, Section 4.18 at 174 (4th. ed. 1985).

The Congressional mandate issued *solely* to the Architect of the Capitol cannot be reconciled with the conduct of the Defendants herein and the refusal of Defendants herein to provide Plaintiff with a copy of the decision of the Hearing Officer which is based not on the sole authority of the Defendant Architect Hantman but on an unauthorized "statement" of unknown provenance effecting thereby an unconstitutional amending of the lawfully promulgated due process 1994 Amended Chapter 752.

28

### 3.  A REASONABLE OFFICIAL WOULD HAVE KNOWN THAT THE DEFENDANTS' CONDUCT WAS IN VIOLATION OF PLAINTIFF'S RIGHTS

The Defendants herein, named in their official and personal capacity, from the time Defendant Savidge submitted his Proposal for the termination of the Plaintiff until Defendant McSeveney issued his Final Decision of termination pursuant to the imprimatur of Defendant Architect Hantman, acted in violation of the constitutional due process procedures provided Plaintiff by the 1994 Amended Chapter 752 as and by the determination of the *Vanover* Court

The constitutional termination process as conducted by said Defendants was implemented in a manner so contrary to due process and the mandated procedures of the 1994 Amended Chapter 752 as to characterize said termination process as a charade and counterfeit process.

An agency of the government, as previously discussed herein this Opposition, must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down. *United States* V. *Heffner*, 420 F.2d 909 (4th Cir. 1970). This doctrine was announced in *United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S. 260, (1954).    There, the Supreme court vacated a deportation order of the Board of Immigration because the procedure leading to the order did not conform to the relevant regulations. The failure of the Board and of the Department of Justice to follow their own established procedures was held a violation of due process. Rules and policies established by an administrative agency are binding on the agency and must be followed by them. *Accardi* v. *Shaughnessy*, 347 U.S.,260, (1954). An administrative regulation promulgated within the authority granted by statute has the force of law and will be given full effect by the courts, and a violation of a valid administrative regulation, even by the authority promulgating same, constitutes in legal effect a violation of the statute. *Westmoreland* v. *Laird* 364 F.Supp 948 (1973).

29

The *Accardi* doctrine was subsequently applied by the Supreme Court in *Service* v. *Dulles*,

354 U.S. 363 (1959) and *Vitarelli* v. *Seaton*, 359 U.S. 535 (1959) to vacate the discharges of

government employees.

In *Service* v. *Dulles*, the Supreme Court vitiated the discharge of a foreign service, officer

because of the State Department's failure to follow its own procedures. The Court concluded that

it made no difference that the State Department had no statutory or constitutional obligation to

establish the procedure in question: "While it is of course true that...the Secretary was not obligated

to impose upon himself these more rigorous substantive and procedural standards,...having done

so he could not, so long as the Regulations remained unchanged, proceed without regard to them.

*Id.* at 388.

These cases are consistent with the purpose of the *Accardi* doctrine to prevent the

arbitrariness which is inherently characteristic of an agency's violation of its own procedures thereby

causing abuses. "Departures from an agency's procedures cannot be reconciled with the fundamental

principle that ours is a government of laws, not men." *Hammond* v. *Lenfest*, cited with approval in

*United States ex rel. Brooks* v. *Clifford*, 409 F.2 at 706 (4thCir.1969).

In the instant matter the Human Resources Act and the duly promulgated statutory

regulations promulgated thereto, the 1994 Amended Chapter 752, and the *Vanover* decision

sufficiently defined the due process procedures to enable an objectively reasonable individual to

understand that Defendants were violating said 1994 Amended Chapter 752 when said Defendants

refused to provide Plaintiff with a copy of the Hearing Officer's decision thereby depriving Plaintiff

an opportunity to review, rebut and appeal the decision of the Hearing Officer was used as a basis

and support by Defendant McSeveney and Defendant Hantman for terminating the Plaintiff and

thereby unconstitutionally limiting Plaintiff's due process opportunity to be heard..

The Defendants, herein named in their personal capacity cannot show that the law was unsettled or that the law was in question at the time they acted.

Moreover, Defendant Counsel Martinez, from his own employment history and legal background, is well familiar with the fact that the 1994 Amended Chapter 752 statutory regulations, the administrative disciplinary policy and practices established by former Architect White pursuant to 2 U.S.C. 1831(c)(2)(F), parallel the disciplinary policy and procedures reflected in 5 U.S.C. 7501 *et seq.* and 5 CFR 752.101 *et seq.*; the duly enacted regulations established for Executive Branch employees by Civil Service law which provide Executive Branch employees with the same due process property interest in employment provided employees of Defendant Office of the AOC: "notice" and "opportunity to be heard" pursuant to which an employee subject to a termination hearing is provided a copy of the Hearing Officer's decision. Absent disclosure of the decision of the Hearing Officer, Defendant Counsel Martinez, a representative of Defendant Office of the AOC at the termination hearing of the Plaintiff, would not have had the opportunity to appeal his termination and discharge from employment with the Equal Employment Opportunity Commission. See Exhibit 14.

Additionally, Defendant Counsel Martinez, counsel to the Defendants herein, is similarly well familiar with the substantive and procedural due process entitlements of the Plaintiff pursuant to the 1994 Amended Chapter 752 and the manner by which said statutory regulations as the 1994 Amended Chapter 752, are adopted, rescinded, amended and abrogated and that a "statement" of unknown provenance, authorship and authority does not comply with the provisions set forth in the Human Resources Act, 2 U.S.C. 1831.

Plaintiff accordingly submits that the Defendants herein named in their personal capacity are not entitled to qualified immunity from the *Bivens* claim of the Plaintiff.

Plaintiff further submits that, irrespective of whether the claimed violation -- refusal to provide Plaintiff with a copy of the decision of the Hearing Officer pursuant to an unauthorized "statement" in a "booklet" of unknown provenance, unknown authorship and unknown authority -- is viewed as a fatally arbitrary "executive act" or *ultra vires* enactment in violation of 2 U.S.C 60-1(a)(1), 2 U.S.C. 60-1(2), 2 U.S.C. 60-1(b) and 2 U.S.C. 1831(d) -- the termination of Plaintiff was substantively and procedurally unconstitutional conduct was "so egregious, that it may fairly be said to shock the contemporary conscience." See *County of Sacramento* v. *Lewis*, 523 U.S. 833(1998).

The termination of Plaintiff from his due process property interest in employment pursuant an unauthorized "statement" of unknown provenance, unknown authorship and unknown authority resulted in denying Plaintiff of one of "those fundamental rights and liberties which are objectively, "deeply rooted in this Nation's history and tradition:" opportunity to rebut and review the decision of the Hearing Officer used as a basis and support for the termination of Plaintiff from his due process property interest is based; a fundamental right "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." See *Washington* v. *Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772(1997) citing *Moore* v. *City of East Cleveland*, 431 U.S. 494, 502(1997) citing *Palko* v. *Connecticut*, 302 U.S. 319, 325, 326(1937).

### E. DEFENDANTS NAMED IN THEIR PERSONAL CAPACITY WERE NOT ACTING WITHIN THE SCOPE OF HIS OR HER EMPLOYMENT

Plaintiff submits that the Defendants named in their personal capacity were not acting within the scope of his or her employment.

Plaintiff notes that the United States Attorney has not certified that Defendants, sued in their individual and personal capacity, were acting within the scope of their employment at the time they refused to provide Plaintiff with a copy of the decision of the Hearing Officer pursuant to the due

32

process 1994 Amended Chapter 752 and the determination of the *Vanover* Court which removed said refusal as a matter of discretion within the legitimate authority of said Defendants.

The placement of Plaintiff in an AWOL status pursuant to the unlawful demand by Defendant Manager Savidge made in violation of the Interim Chapter 630 evidences the turmoil and hostile environment; action not in furtherance of Defendant Office of the AOC.

The overreaching penalty of termination pursuant to Plaintiff's vigorous protestation of Defendant Manager Savidge's unlawful demand for a medical diagnosis in violation of the requirements of the Interim Chapter 630 leave policy evidences action taken beyond the scope of employment.

Said overreaching penalty of termination based on vigorous argument and protestation cannot be reconciled with the failure of Defendant Office of the AOC to discipline the supervisor who assaults an employee in his subordinate chain of command and reveal the instant penalty of termination as exceeding the legitimate aim of the 1994 Amended Chapter 752 discipline policy; action taken outside the scope of employment of Defendants herein.

Defendants noticeably absent assertion that the decision of the Hearing Officer was "an internal management document and not available for disclosure" precluding disclosure of said decision to the Plaintiff, Senator Mikulski and Congress Van Hollen removes validity and authenticity from any certification to be made that Defendants, named in their individual capacity, were acting within the scope of employment.

## CONCLUSION

The record herein demonstrates an unconstitutional breach of unambiguous substantive and procedural due process accruing to the Plaintiff and his due process property interest in employment provided Plaintiff by the 1994 Amended Chapter 752 and the decision of the *Vanover* Court.

33

Defendants' refusal to provide Plaintiff with a copy of the Hearing Officer's decision at the conclusion of the termination hearing deprived Plaintiff of his due process opportunity to review said decision and to seek review consistent with his due process opportunity to be heard pursuant to the 1994 Amended Chapter 752 and the *Vanover* decision.

As a matter of discretion, Defendants' refusal to provide Plaintiff with a copy of the Hearing Officer's decision pursuant to an unauthorized "statement" in an unauthorized "booklet" of unknown provenance and unidentified origin, was removed from the legitimate authority of said Defendants sued in their individual capacity thereby depriving said Defendants not only of immunity but of acting within the scope of employment..

That said unauthorized statement was only created subsequent and pursuant to the determination of the Court in *Vanover* v. *Hantman*, 77 F.Supp. 2d 91(D.D.C. 1991) supports Plaintiff's contention that said statement was to counter the said Court determination that employees of the Office of the AOC were provided with due process property interest in employment. Said unauthorized statement attests to the removal of authority from the actions taken by the Defendants who acted outside the scope of their employment and authority when they refused to provide the Plaintiff with a copy of the decision of the Hearing Officer in violation of the basic legal principle of the "exclusiveness of the record" and thereafter and used said decision as basis and support for their overreaching penalty of termination the Plaintiff depriving said Defendants herein of immunity and action taken within the scope of their employment.

That Defendant Architect Hantman at no time acknowledge that said unauthorized "statement" of unknown provenance and unidentified origin was an amendment to the 1994 Amended Chapter 752 made by him pursuant to his authority set forth in 2 U.S.C. 60-1(a)(1), 2 U.S.C. 60-1(a)(2), 2 U.S.C. 1(b) and 2 U.S.C. 1831 and that the procedures set forth in said

34

unauthorized "booklet" of unknown provenance and unidentified origin were to substitute for the

due process procedures provided in the 1994 Amended Chapter 752 and the decision in *Vanover*

further attests to the removal of authority from the actions taken by the Defendants who acted

outside the scope of their employment and authority when they effected the overreaching penalty

and terminated Plaintiff from his due process interest in employment with Defendant Office of the

AOC.

WHEREFORE, Plaintiff moves the Court to deny Defendants' Motion to Dismiss.


Respectfully submitted,


_____
Jeffrey H. Leib, D.C. Bar #89649
Attorney for Plaintiff
5104 34th Street, N.W.
Washington, D. C. 20008
(202) 362-0682
(202) 244-1120

August 15, 2007

35

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss was electronically sent to Defendants' counsel this 15th day of August, 2007

> Andrea McBarnette, Esquire
> Assistant United States Attorney
> 555 4th Street, N.W.
> Washington, D. C. 20530

> Jeffrey H. Leib

36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT SOLOMON,

      Plaintiff,

    v.                        Civil Action No.:  06-2214(RCL)

OFFICE OF THE ARCHITECT OF THE CAPITOL, *et. al.*,

      Defendant.

DECLARATION OF PLAINTIFF SOLOMON

Robert Solomon, under oath, states as follows:

1. I am the plaintiff in the above captioned matter.

2. I was an employee of the Senate Restaurants from 1986 though December 29, 2003.

3. As a result of illness, I was absent from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003.

4. I had a positive sick leave balance on June 9, 2003, June 10, 2003 and June 11, 2003.

5. On said dates of June 9, 2003, June 10, 2003 and June 11, 2003, I was not on leave restriction.

6. Pursuant to and in accordance with the uniform administrative requirements, terms, conditions and privileges of employment set forth in the "Architect of the Capitol's Interim Personnel Manual Chapter 630-I, Absence and Leave" policy, "Chapter 630-1," I provided Defendant Office of the AOC with appropriate documentation and certification for his absence from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003 in accord with the statutory regulations set forth in Chapter 630-1.

7. On June 16, 2003, I met with my first line supervisor Defendant Savidge, Manager, Capitol Building, United States Senate Restaurants, to obtain approval for his absences from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003.

8. Absent the approval of Defendant Manager Savidge, I would be placed in an AWOL status for my absences from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003; a status subjecting me to disciplinary action pursuant to the 1994 Amended Chapter 752.

9. I was advised by Defendant Manager Savidge that administrative documentation and certification provided by me in compliance with the uniform administrative requirements, terms, conditions and privileges of employment set forth in Interim Chapter 630-1 was insufficient.

10. Defendant Manager Savidge, in violation of the terms, conditions and privileges of employment set forth in Interim Chapter 630-1, demanded I provide a medical diagnosis for my absence from the workplace on June 9, 2003, June 10, 2003 and June 11, 2003.

11. Defendant Manager Savidge's additional demand for a medical diagnosis violated the terms, conditions and privileges of my employment set forth in Interim Chapter 630-1.

12. I vigorously protested Defendant Manager Savidge's additional demand for a medical diagnosis for Plaintiff's absences for June 9, 2003, June 10, 2003 and June 11, 2003 in violation of the terms, conditions and privileges of Plaintiff's employment set forth in Interim Chapter 630-1.

13. Defendant Manager Savidge refused to accept my compliance with the administrative requirements, terms and conditions and privileges set forth in Interim Chapter 630-1 and would not approve the certification provided by me in accordance with said Interim Chapter 630-1.

14. I was placed in an AWOL status for my absence from the workplace on said dates of June 9, 2003, June 10, 2003 and June 11, 2003.

15. By June 16, 2003 letter of Defendant Rebecca Tiscione, Director, Human Resources Management Division of Defendant AOC, I was placed on "administrative leave pending the outcome of an investigation concerning your involvement in an incident which occurred on June 16, 2003, in the office of Mr. Robert Savidge, Manager, Capitol Building, or such time as you may

2

receive notice to return to work."

16.   I was never interviewed pursuant to the investigation by the Human Resources
Management Division

17.   Thereafter, to remove my placement in an AWOL for my absences on June 9, 2003,
June 10, 2003 and June 11, 2003, I acceded to the unlawful additional demands and conditions set
by Defendant Manager Savidge and provided Defendant Manager Savidge with a medical diagnosis
for my absences on June 9, 2003, June 10, 2003 and June 11, 2003 in violation of the administrative
requirements, terms and conditions and privileges set forth in Chapter 630-1.

18. Respondent, by letter of August 6, 2003, proposed my termination from my employment
and from my due process Fifth Amendment property interest in employment pursuant to the
uniform, due process and progressive discipline policy identified as the "Architect of the Capitol's
Personnel Manual Chapter 752 - Discipline," "Chapter 752."

19. The basis of the Proposal to Terminate of August 6, 2003, was "exhibiting hostile and
threatening behavior in the workplace. This conduct violates Sections 5.0 and 5.1 of the Office of
the Architect policy, "Standards of Conduct," dated May 11, 1989, and the Architect of the Capitol's
memorandum dated March 19, 1996, entitled "Violence in the Work Place."

20.   By letter of August 20, 2003 to Defendant Marinaccio, Director of Food Services,
United States Senate Restaurants, I responded to the August 6, 2003, Proposal to Terminate.

21.   Defendant Director Marinaccio, by letter of September 15, 2003, concurred with the
Proposal to Terminate me.

22. I requested an administrative hearing pursuant to said 1994 Amended Chapter 752.

23. Defendant Walker, Human Relations Specialist provided me with a "booklet" of rules
written by an unidentified source which advised me that I was not entitled to and would not be

3

provided a copy of the decision of the Hearing Officer; violation of the procedural and substantive 1994 Amended Chapter 752 due process guarantees of "notice" and "opportunity to be heard" set forth in said uniform, progressive statutory regulations as determined by the District Court in *Vanover* v. *Hantman, et. al.*, 77 F.Supp. 2d 91(D.D.C., 1999).

24. Hearing was conducted pursuant to the due process and progressive discipline policy identified as the 1994 Amended Chapter 752.

25. Mr. Jeffrey H. Leib was my counsel for the termination hearing.

26. Mr. Leib had also represented a friend and former employee of the Senate Restaurants, Mr. Robert Vanover at Mr. Vanover's termination hearing pursuant to which Mr. Vanover received a copy of the Hearing Officer's decision.

27. I am also aware that Mr. Commeree, another client of Mr. Leib and former employee of Defendant Office of the AOC, had received a copy of the Hearing Officer's decision pursuant to Mr. Commeree's termination hearing.

28. I and my counsel were advised by the Hearing Officer at said 1994 Amended Chapter 752 disciplinary hearing that Defendant Office of the Architect of the Capitol had the burden of proof and that the "preponderance of evidence" was the standard of proof and that Defendant Office of the Architect of the Capitol had the burden of proof.

29. I asked for and was refused a copy of the Hearing Officer's decision made pursuant to the hearing conducted on the August 6, 2003 Proposal to Terminate Plaintiff.

30. Pursuant to Defendants' refusal to provide me with a copy of the Hearing Officer's decision at the conclusion of the termination hearing I was denied the opportunity to review the Hearing Officer's decision, findings of facts, conclusions of law and recommendations and denied thereby the opportunity to make a subsequent argument respecting the contents of the Hearing

4

Officer's decision to Defendant McSeveney and Defendant Architect Hantman.

31. By letter of December 22, 2003 of Chief Operating Officer McSeveney, received by me on December 30, 2003, I was terminated effective December 29, 2003, from his due process property interest in employment Defendant AOC.

32. I engaged the assistance of Senator Mikulski and Congressman Van Hollen to obtain a copy of the Hearing Officer's decision pursuant to the 1994 Amended Chapter 752 disciplinary hearing and Defendant Hantman refused to provide Senator Mikulski with a copy of said Hearing Officer's decision.

I declare under penalty of perjury that the foregoing is true and correct.

ROBERT SOLOMON
August 14, 2007



**Order-752-1**

Washington, DC 20515

July 15, 1994

## Order of the Architect of the Capitol

Subject:    Revision of Architect of the Capitol Personnel Manual Chapter
752, "Discipline"

Architect of the Capitol Personnel Manual Chapter 752, "Discipline," revised
July 15, 1994, contains policy and procedures for administering a uniform
disciplinary system. The provisions of this Chapter apply to all employees of
the Office of the Architect of the Capitol, and organizations under the admin-
istrative jurisdiction of the Office.

This revision of Chapter 752 supersedes the policy and procedures contained
in the initial issuance of Chapter 752, which was issued on December 31,
1990.

George M. White, FAIA
Architect of the Capitol

PLAINTIFF'S EXHIBIT #1

AoC PERSONNEL MANUAL
Discipline

752-1
07-15-94

Chapter 752:  Discipline

<u>CONTENTS</u>

Subchapter  1.     General Provisions

        .1     Purpose
        .2     Policy
        .3     Administration
        .4     Applicability
        .5     Actions Covered
        .6     Actions Excluded
        .7     Progressive Application of Actions
        .8     Implementation
        .9     Appeal Procedures
        .10    Administrative Decisions
        .11    Non-work Status
        .12    Penalties
        .13    Records
        .14    Consultation
        .15    Settlement Agreements
        .16    Actions Held in Abeyance

Appendix A.      Informal Actions (Oral and Written Warnings)

        .1     Initiation of Action
        .2     Content of Warnings
        .3     Documentation of Oral Warnings

Appendix B.      Formal Actions

        .1     Initiation of Action
        .2     Content of Letters
        .3     Documentation

Appendix C.      Hearings

        .1     Hearing Officers
        .2     Duties of Hearing Officers
        .3     Hearing Administrator
        .4     Hearing Procedures

Table 1.      Typical Penalties for Infractions

AoC PERSONNEL MANUAL                                                    752-2
Discipline                                                          07-15-94

### Subchapter 1.  General Provisions

### .1     Purpose

The purpose of this Chapter is to establish the policy of the Office of the Architect of the
Capitol on discipline in the work force, and to establish uniform, Office-wide procedures to
be followed in taking disciplinary action designed to address the behavioral or performance
problems of employees.

### .2     Policy

It is the policy of the Office of the Architect of the Capitol to:

    .1     Establish and enforce policies, practices, and procedures to accomplish its
        mission and functions.

    .2     Ensure compliance with established policies, practices, regulations, and proce-
        dures by every employee.

    .3     Ensure that management officials and supervisors are scrupulously fair in
        utilizing disciplinary procedures to assure employee compliance with policies,
        practices, regulations, and procedures.

    .4     Ensure that all employees are informed of the policies, practices, regulations,
        and procedures which govern their actions, employment, or specific situations.

    .5     Ensure that disciplinary actions are taken only for such cause as will promote
        the efficiency of the Office under fair, orderly, and uniform procedures for
        effecting actions which are warranted on their merits.

    .6     Assure employees that they will be afforded due process in all disciplinary
        actions proposed or effected against them.

### .3     Administration

The Director, Human Resources Management Division (HRMD) is responsible for adminis-
tering and evaluating the application of the provisions of this Chapter, and recommending
revisions thereto.  The HRMD shall provide advice, guidance, and assistance to manage-
ment officials and supervisors in proposing and taking disciplinary action against employees.

AoC PERSONNEL MANUAL                                           752-3
Discipline                                                    07-15-94

.4     Applicability

The provisions of this Chapter apply to all permanent employees of the Architect of the
Capitol who are not serving a probationary period, except those employees who are serving
on time-limited temporary, or temporary WAE, appointments and those employees who
occupy Exempt Personnel positions.

.5     Actions Covered

The disciplinary actions covered by this Chapter are, in ascending order of severity, oral and
written warnings; official reprimand; suspension; reduction in grade or pay; and, removal.

.6     Actions Excluded

    .1     Actions covered by different policies and practices.

    .2     Actions separating an employee for reasons not known to the Office at the
time of appointment which, if known, would have precluded employment,
including providing false information during the employment process.

    .3     Actions separating an employee for abandonment, that is, failing to report to
work for 10 consecutive work-days without approved leave, provided reason-
able efforts have been made to communicate with the employee.

    .4     Actions taken against an employee under the direction or regulations of an-
other Federal authority.

    .5     Actions taken against an employee who is convicted and incarcerated.

.7     Progressive Application of Actions

Disciplinary actions are normally imposed in a progressively stringent pattern, the sequence
in which they are effected normally following the order in which they are listed in 1.5 and
shown in Table 1, "Typical Penalties for Infractions" (attached). An exception to the listed
sequence may be recommended by the first-line supervisor if the problem(s) is serious and
should not be handled through progressive actions.

Examples of serious problems include, but are not limited to, those which endanger or
threaten Members of Congress or their staffs and other Office employees; involve the
possession, sale, or receipt of a controlled substance; theft; and all cases involving weapons.

AoC PERSONNEL MANUAL                                        752-4
Discipline                                                 07-15-94

.8     Implementation

The use of all previously established disciplinary action policies and practices is superseded.
Actions in progress on the approval date of this revision shall be completed in accordance
with the procedures under which they were initiated.

.9     Appeal Procedures

The appeal procedures contained herein are for the use of all employees of the Office to
whom this Chapter is applicable.

.10    Administrative Decisions

       .1     The Director, HRMD shall be responsible for providing guidance and resolv-
              ing problems or questions arising under the procedures and provisions of this
              Chapter, including the extension of employee-response time when justified.

       .2     An administrative decision establishes a precedent which must be applied
              consistently in all disciplinary actions processed after its issuance. An ad-
              ministrative decision ceases to establish a precedent after the revision of the
              edition of this Chapter under which it was issued, because all actions pro-
              cessed thereafter are under the provisions of the revised edition.

       .3     Administrative decisions issued between revisions of this Chapter must be
              considered during the next revision of the Chapter.

.11    Non-work Status

       .1     Employees charged by the Office for serious problems, such as those which
              endanger or threaten Members of Congress, their staffs, or other Office em-
              ployees; involve the possession, sale, or receipt of a controlled substance;
              theft, and all cases involving weapons, must be immediately placed in a non-
              work status until their case is resolved.

       .2     Employees under police charges not related to those listed in paragraph 1.11.1
              may return to work with the approval of the management official of their
              organization and the Director, HRMD.

.12    Penalties

There are no mandatory penalties for any problem(s), but Table 1 identifies typical penalties
imposed for infractions. Termination of employment must be proposed in cases involving
charges related to the serious problem(s) identified in paragraph 1.11.1.

AoC PERSONNEL MANUAL                                              752-5
Discipline                                                       07-15-94

.13    Records

    .1    Case files shall contain the documentation of all problems which occur and
the associated corrective action taken. Case files shall be reviewed annually
by their custodians and, if no additional incidents or problem(s) have occurr-
ed, may be destroyed.

    .2    The first-line supervisor, or official who first documents the occurrence of a
problem(s), shall establish a file on the employee. The file must be given to
the first-line supervisor by the person establishing it, and the first-line supervi-
sor will retain the file for one year or until an official action is proposed. If
an official reprimand, suspension, reduction in grade or pay, or removal is
proposed, the file will be placed in the custody of the servicing personnel
specialist, who will retain it for three years. Thereafter, the file shall be de-
stroyed unless additional disciplinary action(s) supports its retention.

    .3    The letters proposing, concurring, and effecting suspension(s), reduction in
grade or pay, and removal actions are filed permanently in the employee's
Official Personnel Folder (OPF) if the employee's appeal is not successful in
contravening the proposed action. Official reprimands may be removed from
the OPF after one year at the employee's written request. Failure to request
the removal of an Official Reprimand will cause it to remain in the OPF.

    .4    Copies of disciplinary action letters are distributed as follows:

        .1    Signed original to the employee.

        .2    Receipt copy to HRMD for filing in the employee's OPF.

.14    Consultation

The opinion of the General Counsel shall be obtained prior to the issuance of suspension
or removal letters in all disciplinary actions, except those actions based on absence without
approved leave and abandonment.

.15    Settlement Agreements

The concurrence of the Director, HRMD, shall be obtained before settlement agreements
with employees are signed. The settlement agreement shall be referred to the Architect,
through the Administrative Assistant, if the Director, HRMD, does not concur with the
provisions of the agreement.

AoC PERSONNEL MANUAL                                          752-6
Discipline                                                   07-15-94

.16    Actions Held in Abeyance

Disciplinary actions may be held in abeyance by the Architect, with or without the recom-
mendation of the Hearing Officer, pending the achievement of a particular milestone or the
accomplishment of a specific goal.  Actions held in abeyance will be effected immediately,
without additional appeal, if the terms for holding the action in abeyance are not fulfilled.

AoC PERSONNEL MANUAL                                              752, A-1
Discipline                                                       07-15-94

<h2 align="center">Appendix A. Warnings</h2>

.1      Initiation of Action

The employee's first-line supervisor, or the official in whose presence the problem(s) or
incident(s) occurred, shall issue the oral or written warning as close to the time of the occur-
rence as possible.

.2      Content of Warnings

    .1      The warning should:

        .1      Identify the specific problem(s) or incident(s).

        .2      State the exact action(s), if any, that should be taken to correct or
        avoid recurrences of the problem(s) or incident(s), including referral
        to the EAP.

        .3      Inform the employee, if applicable, that oral warnings are documented
        and may be used as evidence in a more stringent action if the prob-
        lem(s) persist or recur.

.3      Documentation of Oral Warnings

    .1      First-line supervisors' documentation of oral warnings and the contents of
    written warnings shall include:

        .1      The name and organizational location of the employee being warned.

        .2      Identification of the problem(s) or incident(s).

        .3      The date(s) on which the problem(s) or incident(s) occurred.

        .4      The instructions, if any, the employee must follow to correct or avoid
        recurrences.

        .5      The name of any witness(es) to the problem(s) or incident(s) and to
        the issuance of the warning. [Note: The presence of a witness to an
        oral warning is recommended if the first-line supervisor believes a
        more stringent disciplinary action may be necessary in the future.
        First-line supervisors who decide to have a witness present when an
        oral warning is made should exercise discretion in their choice of a
        person to be a witness. The use of another supervisor as the witness
        is preferable to the use of a co-worker of the employee.]

AoC PERSONNEL MANUAL                                                          752, B-1
Discipline                                                                   07-15-94

## Appendix B.  Formal Actions

.1      Initiation of Action

    .1      The employee's first-line supervisor normally proposes the disciplinary action
against an employee because previously issued warnings have failed to correct
the problem(s), or because of the seriousness of the problem(s). The first-line
supervisor must secure the approval of the second-line supervisor before
contacting the servicing personnel specialist. Management officials or super-
visory personnel other than the employee's first or second-line supervisors
must secure the Director, HRMD's approval before proceeding further.

    .2      The first-line supervisor shall, after receiving approval to propose the disci-
plinary action, provide the personnel specialist who services the employee's
organization with evidence of the problem(s) or incident(s) and a draft of the
charge(s) to be specified in the proposal letter. The charge(s) must be sup-
ported by warnings previously issued, continued violations on which previous
action(s) was taken, or specific evidence if the action is the first disciplinary
action proposed.

    .3      The personnel specialist shall assist the first-line supervisor in the preparation
of the letter and secure the approval of the Director, HRMD, or his designee,
of the proposal letter before it is signed and delivered to the employee.

    .4      The first-line supervisor must sign and  deliver the proposal letter and obtain
the recipient's signature on the receipt for the letter. Personnel specialists
may be instructed to deliver proposal letters signed by other officials.

    .5      The signature of a witness to the attempted delivery of the proposal letter is
required if the employee declines to sign the receipt or accept delivery of the
letter. Letters mailed to the employee's residence must be sent by return
receipt mail, or equivalent delivery, to ensure the Office receives documenta-
tion of delivery. Disciplinary actions may proceed, however, after five work-
days if receipt is not obtained.

    .6      The employee's explanation and statements in response to the charge(s), to
the second-line supervisor, or official identified in the proposal letter, shall be
addressed in that official's letter. The personnel specialist and concurring
official must ensure that, to the extent possible, the concurrence letter clearly
explains the rationale for concurring with the proposal after consideration of
the employee's response, if any. The personnel specialist shall secure the
approval of the Director, HRMD, or his designee, of the concurrence letter
before it is signed and delivered to the employee.

AoC PERSONNEL MANUAL                                                    752, B-2
Discipline                                                             07-15-94

.7    The employee may respond in writing to the concurrence letter to issue a
      formal disciplinary action within five work-days of its receipt. All formal
      d'sciplinary actions, except Official Reprimands, shall be automatically re-
      ferred to a Hearing Officer by the Hearing Administrator after the response
      period has expired, except as provided in B.1.9. The Hearing Officer will:
      review the case; conduct a formal Hearing if requested by the employee; and,
      provide the Architect with a finding(s) and recommendation(s) on which his
      decision on the appeal can be based.

.8    Official reprimands will be referred to a Hearing Officer at the written re-
      quest of the employee within five work-days of receipt of the concurrence
      letter. Official reprimands will be reviewed, without a formal Hearing, and
      sent to the Architect with finding(s) and recommendation(s) on which his final
      decision on the appeal can be based.

.9    No formal action shall be filed in the employee's OPF until: the Architect
      issues his decision on the employee's appeal; the time period for filing an
      appeal has elapsed; or, the employee has agreed in writing to accept the pro-
      posed penalty and waives in writing the right to a review or formal Hearing,
      whichever of these situations occurs first.

.2    Content of Letters

      .1    The proposal letter must:

            .1    State that the first-line supervisor intends to take a formal disciplinary
                  action against the employee.

            .2    Specify the problem(s) for which the action is proposed and, except in
                  removal actions, refer the employee to the EAP.

            .3    Inform the employee of the right to review the material which supports
                  the reason for the proposed action.

            .4    Advise the employee of the right to respond in writing to the reason(s)
                  for which the action is proposed, within five work-days of receipt of the
                  proposal letter, to the second-line supervisor or to a concurring official
                  identified by the Director, HRMD, if the Office official signing the
                  letter is not in the supervisory structure of the employee's organization.

            .5    Assure the employee that a concurrence letter which considers only the
                  reasons specified in the proposal letter and the employee's response
                  thereto shall be issued.

AoC PERSONNEL MANUAL                                                          752, B-3
Discipline                                                                   07-15-94

.6    State that a copy of all letters and Notifications of Official Personnel Actions (SF 50) shall be placed in the employee's OPF as permanent records if the appeal to the Architect is not successful, and may serve as evidence in a subsequent, more stringent action.

.2    The concurrence letter must, as appropriate:

.1    State that the reviewing official concurs with, modifies, or withdraws the proposed disciplinary action.

.2    Specify the problem(s) or incident(s) for which the action is issued.

.3    Inform the employee of the right to review the material which supports the reasons for the action.

.4    Advise the employee of the right to submit a written appeal, which may include a request for a formal Hearing, within five work-days of receipt of the concurrence letter.

.5    Assure the employee that the Architect's final decision on the appeal will consider only the reasons specified in the proposal letter; the information submitted in the appeal; and, the Hearing Officer's finding(s) and recommendation(s).

.6    Inform the employee that a copy of all letters and SF 50s, if applicable, shall be placed in the employee's OPF and may serve as aggravating evidence in a subsequent action, if the appeal is not successful and removal is not effected.

.3    The final decision letter must:

.1    State that the letter is the Architect's final decision on the case and specify the penalty, if any, which is being imposed.

.2    Assure the employee that the final decision was based on the reasons specified in the letters proposing and concurring with the action; the employee's response thereto; and, the Hearing Officer's finding(s) and recommendation(s).

.3    Inform the employee of the disposition of the case records.

.3    Documentation

Documents supporting proposal and concurrence letters must be included in the case file.

AoC PERSONNEL MANUAL                                                 752, C-1
Discipline                                                          07-15-94

## Appendix C.  Hearings

.1    Hearing Officers

    .1    The responsibility for serving as a Hearing Officer shall be shared by all management officials. To the extent feasible, each management official must take a turn as a Hearing Officer before the process is repeated.

    .2    Management officials shall not serve as Hearing Officers on cases involving their own employees or when a conflict of interest or reason which, in the opinion of the Director, HRMD, precludes their service on a disciplinary case.

    .3    The Director, HRMD, with the concurrence of the Administrative Assistant, may secure the services of a qualified person who is not an employee of the Office of the Architect of the Capitol to serve as a Hearing Officer.

.2    Duties of Hearing Officers

The Hearing Officer shall:

    .1    Approve the witness request(s) submitted by the Office Representative and Employee Representative at least three work-days prior to the Hearing.

    .2    Make decisions on procedural questions during a Hearing.

    .3    Ask questions of the Office Representative, the Employee Representative (if one has been designated), witnesses, and the employee during the Hearing.

    .4    Provide a finding(s) and recommendation(s) to the Architect based on the information available to him through his review of the case file and the information presented at the formal Hearing, if one is requested by the employee.

.3    Hearing Administrator

The Director, HRMD shall designate a member of the staff as the Hearing Administrator for actions appealed to the Architect. The Hearing Administrator shall:

    .1    Designate a management official as the Hearing Officer for actions appealed to the Architect, and schedule and conduct a formal Hearing at the employee's request.

    .2    Suspend, or terminate, a Hearing when the circumstances of the case or the Hearing so warrant.

AoC PERSONNEL MANUAL
Discipline

752, C-2
07-15-94

  .3    Transmit the Hearing Officer's finding(s) and recommendation(s) to the Architect for his decision.

.4   Hearing Procedures

  .1    The Hearing Administrator shall:

    .1    Convene the Hearing at the appointed time.

    .2    Introduce the participants; state the purpose of the Hearing; and, review the procedures which are used to conduct the Hearing.

  .2    The Office Representative shall present the Office's case, evidence, and the testimony of witnesses approved by the Hearing Officer to support the charge(s).

  .3    The employee, or the Employee Representative, shall have the opportunity to question any evidence submitted and witnesses appearing at the Office Representative's request.

  .4    The employee, or the Employee Representative, then presents the employee's appeal, including any evidence and the testimony of witnesses approved by the Hearing Officer as relevant to the charge(s).

  .5    The Office Representative shall be given the opportunity to question any evidenced submitted and any witnesses appearing at the employee, or Employee Representative's, request.

  .6    The Office Representative may make a closing statement regarding the Office's case against the employee and the proposed penalty.

  .7    The employee, or Employee Representative, may make a closing statement regarding the employee's response to the Office's charges and the penalty proposed.

  .8    The Hearing Administrator shall summarize the procedures to be followed after the Hearing is adjourned.

  .9    The Hearing Administrator shall adjourn the Hearing.

  .10    The Hearing Officer shall, within ten work-days of the completion of the Hearing unless an extension of time is granted by the Architect, then:

    .1    Determine the relevancy of the testimony and evidence presented.

AoC PERSONNEL MANUAL
Discipline

.2    Discuss in a written report to the Architect:

.1    The merits of the charges presented.

.2    Findings of fact which address the nature and extent of the offense allegedly committed by the appellant.

.3    Express an opinion on the appropriateness of the adverse action in relation to the charge.

.4    Make a recommendation on the proposed action.

.5    Communicate by separate memorandum to the Architect any information developed during the Hearing which concerns personnel administration in the Office.

AoC PERSONNEL MANUAL
Discipline

752, T-1
07-15-94

## Table 1.  Typical Penalties For Infractions

| | INFRACTION | 1st Offense | 2nd Offense | 3rd Offense |
|---|---|---|---|---|
| 1. | Absence without authorized leave, or failure to follow instructions regarding the requesting of leave. | Reprimand | Suspension | Removal |
| 2. | Failure to obey the reasonable orders of a supervisor/management official. | Reprimand | Suspension | Removal |
| 3. | Possession of a controlled substance. | Removal | | |
| 4. | Possession of a weapon. | Removal | | |
| 5. | Endangering or threatening Members of Congress, their staffs, or employees of, or under the administrative jurisdiction of, the Office. | Removal | | |
| 6. | Failure to perform assigned duties in a satisfactory manner. | Reprimand | Suspension | Removal |
| 7. | Sleeping on job. | Reprimand | Suspension | Removal |
| 8. | Unauthorized use, removal of Government property, funds, services, supplies, or materials, including use or permitting the improper use of Government charge cards, Accounting Control Transaction (ACT) numbers or other obligating forms or devices, or the property or other employees. [In arriving at the penalty, consideration should be given to the value of the property involved and whether voluntary restitution was made]. | Reprimand to Removal | Removal | |
| 9. | Knowing and willful misstatement or omission of material facts, forms, unlawful concealment, removal, alteration, mutilation, or destruction of any official document, contract files, or records. | Reprimand to Removal | Removal | |
| 10. | Violation of the Standards of Conduct. | Reprimand | Suspension | Removal |
| 11. | Falsification or alteration of a document. | Reprimand to Removal | Removal | |
| 12. | Knowing and willful misappropriation of Government funds or other funds which come into employee's possession by reason of his or her official position. | Removal | | |
| 13. | Knowing and willful misstatement or one or more claims (travel vouchers, imprest fund vouchers, time and attendance records, etc.) [Penalty depends on the value of the property or amount of employee time involved, the nature of the position held by the offending employee, and other factors.] | Reprimand to Removal | Removal | |
| 14. | Knowing and willful use of public office for private gain. | Removal | | |
| 15. | Misconduct whether or not in violation of a criminal statue, which impairs job performance or trustworthiness of the employee or otherwise affects the ability of a part of AoC to perform its mission. | Reprimand to Removal | Removal | |
| 16. | Theft, actual or attempted; unauthorized possession of Government property or property of others. | Removal | | |
| 17. | Failure, through negligence, to account properly for Government funds. | Reprimand | Suspension | Removal |
| 18. | Willful use or authorizing use of Government-owned or leased passenger motor vehicles for unofficial purposes. | Reprimand | Suspension | Removal |

| INFRACTION | 1st Offense | 2nd Offense | 3rd Offense |
|---|---|---|---|
| 19. Loss of, or damage to, Government property. | | | |
|    a. Through carelessness or negligence, or when property involved is of small value. | Reprimand | Suspension | Removal |
|    b. Through maliciousness or intent, or when property involved is of significant value. | Suspension | Removal | |
| 20. Using Government property or AoC employees in a duty status for other than official purposes. [Penalty depends on the value of the property or amount of employee time involved, the nature of the position held by the offending employee, and other factors.] | Reprimand | Suspension | Removal |
| 21. Negligent control of ACT numbers, Government charge cards, and other obligating forms and devices. | Reprimand | Suspension | Removal |
| 22. Refusal to provide information in connection with an authorized investigation, and to furnish a signed statement when required, except where such refusal is based upon grounds or self-incrimination in potential criminal prosecution, or privileged communications. | Reprimand | Suspension | Removal |
| 23. Negligent or willful mismanagement of a contract, or failure to administer provisions thereof, whether or not it results in a loss to the Government. | Reprimand | Suspension | Removal |
| 24. Negligent or willful failure to maintain contract files in complete for contracts in accordance with applicable regulations. | Reprimand | Suspension | Removal |
| 25. Knowing and willful failure to secure adequate and required competition for contracts in accordance with applicable regulations. | Reprimand | Suspension | Removal |
| 26. Awarding of more than one contract/purchase order with the intent of avoiding limitations on contacting authority or the requirements of applicable regulations. | Reprimand | Suspension | Removal |
| 27. Negligent or willful: | | | |
|    (1) Acceptance of incomplete services, supplies, or materials; or, | Reprimand to Removal | Removal | |
|    (2) Misrepresentation of contract inspections and certification for work not performed or services, supplies, or materials not received. | | | |
| 28. Negligently or willfully preparing or issuing a contract for quantities which exceed reasonable requirements. | Suspension | Removal | |
| 29. Negligently preparing an inaccurate Government estimate resulting in the acceptance of a given bid/price proposal from a contractor which thereby causes loss to the Government. | Suspension | Removal | |
| 30. Soliciting or making a contribution for a gift (as defined by AoC Standards of Conduct) to an official superior, or acceptance of such a gift by an official superior. | Reprimand | Suspension | Removal |
| 31. Unethical or improper use of official authority or credentials, or unauthorized disclosure or use of official information. | Reprimand | Suspension | Removal |
| 32. Improper solicitation or acceptance of gifts, loans gratuities favors, etc., from persons, firms, or corporation with whom employees have official relations. | Reprimand | Suspension | Removal |
| 33. Deliberate misrepresentation, concealment or withholding or a material fact or refusal to testify or cooperate in an official proceeding. | Reprimand to Removal | Removal | |

NS/16/03
06/16/03

RS
6/17

# ARCHITECT OF THE CAPITOL
# APPLICATION FOR LEAVE

June 16th, 2003  10:30

I, Robert Solomon

request Three days  Annual (Sick leave.)

commencing Monday 6/9/03

ending Thursday 7:00am 6/12/03 , inclusive

The reason for this absence Out Sick

My address while absent will be _____

(Signed) Robert Solomon

Recommended: _____

Approved: _____

GPO: 2002  77-294 (mac)

1. Annual leave must be requested and approved in advance. Note: Requests for annual leave for vacation purposes when Senate is expected to be in session must be approved by the Director of Food Services. (See your bulletin board)

2. If accrued annual leave is not sufficient to cover your request, the hours in excess of the accrual will be recorded as Absent Without Approved Leave.

Administrative Office SD–G55 (White Copy)
Employee's (Yellow Copy)
Supervisor's (Pink Copy)

*U.S. GPO: 2002-077-294/51253

- PLAINTIFF'S EXHIBIT  #2-

**RAJEEV BATRA, MD**
**11120 NEW HAMPSHIRE AVE., SUITE 309**
**SILVER SPRING, MD 20904**
**301 593 9612**

## SICK CERTIFICATE

Name: _Robert Solomon_ Date: _6-11-03_

Address: _____

To Whom it may concern:

This is state that above patient _Robert Solomon_ was seen in my office. The patient is unable to work from _6·9·03_ to _6.11.03_. Please call with question.

Remarks _Patien was in the office Today and will Return to work on 6.12.03_

_Rajeev Batra_ **M.D.**

RAJEEV BATRA M.D.
11120 NEW HAMPSHIRE AVE. #309
SILVER SPRING, MD 20904

- PLAINTIFFS EXHIBIT #3-

NAME: SOLOMON, ROBERT   SSN#: 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   T&A PAY PERIOD: 11   DATE: 06/16/2003

T&A CONTACT POINT:   SR 11   0010 66 01       FULL TIME       PAY PERIOD DUTY   60.00

.T-WORK-SCHD:   NORMAL

| PREFIX | TRANSACTION-DESC | SUFFIX | WEEK1 | WEEK2 | ACCOUNTING DATA | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | REGULAR TIME | | 40.00 | 3.50 | 324 | 5070 | 0000 | 0000 | 12 |
| | SICK LEAVE | | | 12.50 | 324 | 5070 | 0000 | 0000 | 12 |
| | AWOL | | | 24.00 | | | | | |

WEEKLY HOURS IN PAY STATUS............:   40.00   16.00

TOTAL HOURS IN PAY STATUS ................:   56.00

WEEKLY OTHER HRS   ............:   0.00   24.00

TOTAL OTHER HRS   ............   24.00

ANNUAL LEAVE CATEGORY:   8.00
SICK LEAVE CATEGORY:   4.00
CEILING:   240.00

REMARKS: (MAX. 23 CHAR.)

PAY PERIOD   11

BEGIN   END

06/01/2003   06/14/2003

| | ————— LEAVE RECORD ————— | | | |
|---|---|---|---|---|
| TYPE | BALANCE FORWARD | ACCRUED | USED | ENDING BALANCE |
| ANNL | 0036.3 | 08.0 | 00.0 | 0044.3 |
| SICK | 0177.0 | 04.0 | 12.2 | 0168.2 |
| COMP | 0.0 | 0.0 | 0.0 | 0.0 |
| LWOP | 0.0 | | 0.0 | 0.0 |
| AWOL | 0001.0 | ----- | 24.0 | 0025.0 |
| SUSP | 0.0 | | 0.0 | 0.0 |
| MILR | 00 | <DAYS> | 00 | 00 |
| MILE | 0.0 | | 0.0 | 0.0 |
| OTHR | 0.0 | 0.0 | 0.0 | 0.0 |
| CRED | 0.0 | 0.0 | 0.0 | 0.0 |
| HOME | 0.0 | 0.0 | 0.0 | 0.0 |
| SHOR | 0.0 | 0.0 | 0.0 | 0.0 |
| ADMN | 0.0 | 0.0 | 0.0 | 0.0 |
| FURL | 0.0 | | 0.0 | 0.0 |
| COMR | 0.0 | 0.0 | 0.0 | 0.0 |
| FFAM | 0.0 | | 0.0 | 0.0 |
| INJU | 0.0 | | 0.0 | 0.0 |
| TOFF | 0.0 | | 0.0 | 0.0 |

CERTIFIED TIMEKEEPER _____ EMPLOYEE _____   SUPERVISOR _____
Certified Correct: All Regular Time, Leave, Overtime, Night Differential and Holiday Time was worked and approved to Law and Regulations.

PLAINTIFF'S EXHIBIT #4



**ORDER 630-1**

Washington, DC 20515

May 12, 2000

Order of the Architect of the Capitol

| | |
|---|---|
| **Subject:** | Architect of the Capitol Human Resources Management Manual, Chapter 630, "Absence and Leave" |
| **Purpose** | To forward and clarify interim policy for administering sick leave. |
| **Brief Description** | This policy describes appropriate circumstances under which supervisors can require documentation for approval of requests for sick leave. |
| **Effective Date** | May 12, 2000 |
| **Recissions** | None. This policy, however, supercedes any previously issued directives or policy on sick leave. |

Alan M. Hantman, AIA
Architect of the Capitol

- PLAINTIFF'S EXHIBIT   #5 -



# Human Resources Management Manual
# Chapter 630, Absence and Leave



**Date: May 12, 2000**

## SECTION A:  SICK LEAVE

**1.      PURPOSE**

This policy establishes uniform AOC sick leave administration procedures and supercedes any previously issued directives or policy on sick leave.

**2.      COVERAGE**

The following AOC employees are covered by this policy:

- permanent, both full and part-time,
- temporary, when the appointment is expected to last for more than 90 days.

**3.      EXCLUSIONS**

The following personnel are not covered by this policy:

- Individuals paid at the Davis-Bacon Act rates
- Contractors

**4.      DEFINITIONS**

a.  **Medical certificate:**  an original document on printed letterhead paper that legibly shows:

(1)     the doctor's name and address;
(2)     the signature of a licensed physician or other acceptable health care professional,
(3)     dates of incapacitation.

b.  **Acceptable health care professional:**  Alternate providers include, but are not limited to nurse practitioner; physician's assistant; chiropractor; acupuncturist; and optometrist.  It does not include a clerk or receptionist.

Continued on Next Page

May 12, 2000                                                              HRMD Manual 630

## 5.    RESPONSIBILITIES

### A. Supervisors

Supervisors are responsible for effective leave administration within their work unit, assuring that employees are aware of leave policies and procedures, and that all absences are properly documented and accounted for on time and attendance records.

### B. HRMD

Establish policy for the administration of sick leave. Assist managers with difficult leave situations.

## 6.    MANDATORY APPROVAL OF SICK LEAVE

There are circumstances when the supervisor must approve a sick leave request. If the employee requesting sick leave has (1) accrued sick leave, (2) followed leave procedures established by the organization, and (3) provided acceptable medical documentation as required, the supervisor must approve the sick leave request when the employee:

- is unable to work due to physical or mental illness, disability, injury, pregnancy-related medical conditions; or
- is receiving emergency medical, dental or optical examination or treatment; or
- would jeopardize the health of others in the workplace because of possible exposure to a communicable disease; or
- must be absent from work for a purpose related to the adoption of a child.
- provides care for a family member who is incapacitated as the result of physical or mental illness, injury, pregnancy, or childbirth, or makes arrangements necessitated by the death of a family member or attends the funeral of a family member. (There are restrictions on the amount of sick leave used for these purposes. Contact the Management, Employee and Labor Relations Branch, HRMD, for further information.)

| | | |
|---|---|---|
| **MANDATORY APPROVAL OF SICK LEAVE (con't)** | • | is entitled to use leave under family and medical leave provisions when the employee has a serious health condition; must care for a family member who has a serious health condition; for the birth of a child and care of the newborn; or the placement of a child with the employee for adoption or foster care. Contact the Management, Employee and Labor Relations Branch, HRMD, for further information. |

7. **SUPPORTING EVIDENCE**

Normally, in the absence of abuse, the employee's own statement of illness or incapacitation for health reasons is sufficient to support a request for sick leave for two consecutive work days or less.

**3 Days or More**

The employee must provide acceptable evidence to support requests for sick leave for three or more consecutive work days. Acceptable evidence depends on individual circumstances and the supervisor's judgment. Such evidence may include:

• An employee's signed statement explaining the nature of the illness only when it is unreasonable to require a medical certificate, for example, because the specific illness did not require the service of a physician or other health care professional. A supervisor authorized to approve leave may, however, require a medical certificate instead of continued reliance on an employee's written statement.

• A medical certificate.

8. **SUSPECTED ABUSE OF SICK LEAVE**

When there is reason to believe that an employee is abusing sick leave, the supervisor should first counsel the employee concerning the questionable use of sick leave. The supervisor should advise the employee that a medical certificate or detailed medical statement may be required to support any future granting of sick leave, regardless of the length of the absence. The supervisor should document the discussion and provide a copy of the documentation to the employee.

3

Continued on Next Page

| 9. | LEAVE RESTRICTION | If the employee continues a pattern of sick leave abuse, the supervisor should then issue the employee a leave restriction letter requiring that the employee support all future requests for sick leave with an acceptable medical certificate. (Supervisors should contact the Management, Employee and Labor Relations Branch at 226-0750 for advice.) This letter will clearly state all requirements and conditions imposed. Failure to comply with the leave restriction letter may be considered a basis for denying leave (sick, annual or leave without pay), and carrying the employee in an absent without leave (AWOL) status. An employee who is placed on leave restriction for the first time shall be placed on restriction for 6 months, however, the supervisor will review the employee's attendance record within 90 days and make a written determination as to whether the leave restriction is continued. |
|---|---|---|

At the end of the 6-month period, the employee should be notified that he/she is no longer subject to the leave restriction requirements, or that a new 6-month leave restriction is being imposed.

| 10. | REFERENCES | This policy is established under the following references: |
|---|---|---|

- 40 U.S.C. §166b-7
- 5 U.S.C. § 6301 et. seq.

For bargaining unit employees, the provisions of this Order may be superceded, where applicable, by a collective bargaining agreement.

End of Document



Washington, DC 20515

June 16, 2003

Mr. Robert G. Solomon, Jr.
U.S. Senate Restaurants
Washington, DC 20510

Dear Mr. Solomon:

This is to inform you that I am placing you on paid administrative leave, effective immediately upon your receipt of this letter. You shall remain on administrative leave pending the outcome of an investigation concerning your involvement in an incident which occurred on June 16, 2003, in the office of Mr. Robert Savidge, Manager, Capitol Building, or such time as you may receive notice to return to work.

Further, you will not be granted access to non-public areas within the Capitol complex while you are on administrative leave.

You may telephone Ms. Barbara Metz of the Human Resources Management Division at (202) 226-2549 if you have any questions.

Sincerely,

Rebecca H. Tiscione
Director, Human Resources

Received _Robert Solomon_

Delivered _____

Witness _____

- PLAINTIFF'S EXHIBIT #6 -

Date _6-17-2003_

**SATISH ANGRA, M.D., P.C.**
344 UNIVERSITY BOULEVARD
SUITE 113
SILVER SPRING, MD  20901

TELEPHONE (301) 593-3400

NAME _Robert Solomon_____ AGE ___

ADDRESS _____ DATE _6/16/03_

℞  Please excuse

him from

6/9 to · 6/13/03.

| Dx. Acute Bronchitis

Call me if

any questions

☐ LABEL

REFILL ___:___ TIMES

_SK Angra_ M.D.

— PLAINTIFF'S EXHIBIT #7—



*Overnight and regular mail on 8-6-2003*

Washington, DC 20515

UNITED STATES SENATE RESTAURANTS

August 6, 2003

---

EXPRESS MAIL -
RETURN RECEIPT REQUESTED

— PLAINTIFF'S EXHIBIT #8 —

Mr. Robert G. Solomon, Jr.
8006 - 14th Avenue, #202
Hyattsville, MD 20783-3909

Dear Mr. Solomon:

I am proposing to remove you from your position of Grill Attendant with the U.S. Senate Restaurants. The basis of this proposal is exhibiting hostile and threatening behavior in the work place. This conduct violates Sections 5.0 and 5.1 of the Office of the Architect policy, "Standards of Conduct," dated May 11, 1989, and the Architect of the Capitol's memorandum dated March 19, 1996, entitled "Violence in the Work Place." Specifically:

> On June 16, 2003, at approximately 10:45 a.m., you came to my office, placed your request for sick leave for June 9, 10 and 11 on my desk, and asked me to sign it because you had to get it over to the Time and Attendance (T&A) Clerk right away. You did not have a leave request for your absence on June 12 and 13. While you went downstairs to get it, I called the T&A Clerk and was advised that she needed the leave requests by noon in order for the time to not be recorded as AWOL. While I was on the telephone, Steven Johnson, Assistant Manager, Capitol Building, came into the office and sat down at his desk.

> When you returned to my office, I informed you that I would take your slips to the T&A Clerk, but that your request for sick leave for June 9, 10 and 11 would not be approved because the documentation was insufficient to approve the leave. You then came to my desk, where I was sitting in my chair, and stood over me, saying that I had no right to ask for more documentation, that I needed to sign the leave request, and that you wanted it then to take to the T&A Clerk. I told you that you needed to leave my office. You refused to leave and kept arguing your points. You became very angry, loud and aggressive while standing over me.

Mr. Robert G. Solomon, Jr.
August 6, 2003
page two

Feeling threatened at this point, I stood up, but there was nowhere to go because of the size and arrangement of the office. I again, more forcefully, asked you to leave my office, but you took steps toward me and blocked me into a corner. You started to yell that you didn't need to leave. You stepped up to me toe to toe, not less than three inches from my face. When I repeatedly told you that you needed to back away and get out of my office, your volume escalated and you continued to say that you were not going to leave.

Mr. Johnson addressed you by name and advised you that I had already called the T&A Clerk regarding your leave slip, to which you replied, "Steve, don't Robert me." Mr. Johnson continued to try to defuse the situation by talking to you, but you would not listen to either of us and continued to be loud and aggressive. At this point, as Mr. Johnson was seriously considering getting a police officer, your supervisor, Naomi Durant, knocked on the door and entered the office, leaving the door open behind her. Ms. Durant called your name several times to get you to back away, but you continued to stay in my face, blocking me in the corner while I repeatedly told you to leave the office. Eventually, you backed away and left the office with Ms. Durant.

On December 1, 1999, Chef Don Perez counseled you regarding your inappropriate behavior during a verbal altercation with Andreas Kyriacos, Food Service General Manager, on August 25, 1999. At the time of the altercation, you failed to leave when Mr. Kyriacos asked you to, spoke to him in a disrespectful manner, and engaged in confrontational conduct by your proximity to him.

By letter dated June 16, 2003, Rebecca H. Tiscione, Director, Human Resources, placed you on paid administrative leave pending the outcome of an investigation concerning your involvement in an incident which occurred on June 16, 2003, in my office, or such time as you may receive notice to return to work. You are to remain on paid administrative leave until further notice.

If you have questions about this proposal, please contact me, or Barbara Metz, Employee Relations Specialist, at (202) 226-2549 with your questions.

You have the right to review the material on which the proposal is based. If you wish to review the material, please contact Ms. Metz at the above phone number to schedule an appointment.

Mr. Robert G. Solomon, Jr.
August 6, 2003
page three


You have the right to reply to this proposal within 5 work days after your receipt of this letter. Your reply must be in writing to Mr. Michael Marinaccio, Director of Food Services, U.S. Senate Restaurants, Room SD-B02, Dirksen Senate Office Building, Washington, DC 20510. Due to mail delays, you should personally deliver your reply or fax it to (202) 228-4650, Attention: Mr. Marinaccio. Mr. Marinaccio will consider your written reply, if any, along with this proposal. He has the authority to modify the discipline proposed. You will receive a written response from Mr. Marinaccio advising whether he concurs in this proposal.

If the final decision of the Architect directs your removal, a permanent record of such discipline will be placed in your Official Personnel Folder.

Sincerely,

Robert J. Savidge
Manager, Capitol Building
U.S. Senate Restaurants

Date:   August 20, 2003

To:     Mr. Michael Marinaccio
        Director of Food Services
        U. S. Senate Restaurants

From:   Mr. Robert Solomon
        U. S. Senate Restaurants

RECEIVED

2003 AUG 20  P 4: 16

OFFICE OF THE CAPITOL
OFFICE
ADMINISTRATION

Subject: Response to Mr. Savidges' letter dated August 6, 2003 Proposal to Terminate


## STATEMENT

In response to Mr. Savidge's proposal to terminate, the undersigned hereinafter presents his
objections to the procedural and substantive Fifth Amendment due process violation contained in
Mr. Savidge's Proposal to Terminate for which no mechanism has been provided to address the
procedural and substantive violations hereinafter set forth.

A.      Chapter 752 provides no burden of evidence, no burden of persuasion, no burden of
        proof and no standard of proof. Accordingly, the proposal to terminate, has made my
        commission of the charges contained therein a fait compleat, a matter of record, an
        irrefutable presumption of "guilt". Mr. Savidge's proposal relegates my response to
        simply a matter of mitigation the penalty imposed for that which has, without benefit of a
        hearing, been proven and determined by Mr. Savidge. Absent the burden of proof,
        persuasion and standard of proof, the hearing is merely a "drill" and a sham.

B.      It is not my duty to inform you of the invalidities in the evidence and proof of Mr.
        Savidge merely mitigate and avoid the penalty of termination proposed by Mr. Savidge.
        It is the agency's duty to prove the allegations made by Mr. Savidge pursuant to
        previously known and identified burdens of evidence, persuasion, and proof as well as a
        previously known and identified standard of proof.

C.      The Disciplinary File contains no General Counsel's opinion, a violation to the Chapter
        752 and the system of checks and balances provided to me by Chapter 752. The very
        same administrators who have a direct and personal and substantial interest in the
        outcome of the proposal to terminate, Mr. Marinaccio and Mr. Mr Savidge, are the
        administrators against whom I brought a complaint of religious discrimination in the
        Office of Compliance pursuant to the Congressional Accountability Act.

D.      The proposal to terminate provides me with no opportunity to address the retaliatory
        nature of the proposal to terminate. The proposal to terminate and Chapter 752 has not
        been invoked by my commission of an offense but has been improperly invoked in



PLAINTIFFS EXHIBIT  #9

retaliation for my prior participation in federally protected activities in the Office of Compliance pursuant to my allegations of discrimination base on religion and violation of Section 201(a)(1) of the Congressional Accountability Act.

E.    No mechanism is available to the undersigned to exclude and suppress questionable documents not made available to the under signed contemporaneous with their production i.e. the memorandum written by Mr. A.P. Kyriacos dated August 26, 1999

## BACKGROUND AND THE ATTENDANT CIRCUMSTANCES

- On June 16, 2003 pursuant the use of approximately 36 hours of accrued sick leave I was contacted by Ms. Mardes the Time and Attendance Clerk

- Ms. Mardes requested copies of sick leave slips for the time frame of June 9, 2003 through June 13, 2003

- Ms. Mardes further requested that the leave slips be submitted to her before 12 noon

- I presented the sick leave slips to Ms. Mardes per her request

- Ms. Mardes stated that she needed Mr. Savidge's signature, noting that the sick leave slips were already signed and recommended for approval by Ms. Durant my first line supervisor

- As a result of Ms. Mardes' request I proceeded to Mr. Savidge's office to obtain the approval for the use of accrued sick leave for June 9 through June 13, 2003

- At approximately 10:45 I entered Mr. Savidge's Office and presented the aforementioned leave slips and supporting medical documentation

- Mr. Savidge viewed may leave slips and supporting medical documentation and requested me to "step outside" his office during the intervening events Mr. Savidge pick up the phone and made a call

- Pursuant to Mr. Savidges' request I left his office, returning to the snack bar to retrieve additional document

- I returned to Mr. Savidge's office at approximately 11:00

- Mr. Savidge upon my return to his office advised me that he was not approving the use of accrued sick leave for the dates of June 9th, June 10th and June 11th, because my medical certification lacked a "diagnosis"and that he had already informed Olivia (Ms. Mardes ) of his decision to deny my use of accrued sick leave based upon insufficient *"medical certification"*

I advised Mr. Savidge that my medical certification was in accordance with the agency's sick leave policy 630-1

I further stated to Mr. Savidge that according to the agency's sick leave policy (630-1) the *medical certificate* only required the doctor's name and address on letterhead paper, the signature of the doctor and the dates of incapacitation

Mr. Savidge further stated that my use of accrued sick leave for June 12th and June 13th, which resulted from the same underlying medical condition, would be approved absent any *"medical certification"*

Mr. Savidge further stated that he would take the "leave slips" to Olivia ( Ms. Mardes) I made the general statement to Mr. Savidge that Olivia had requested that I needed to bring the "leave slips" to her prior to 12 noon in order to process time and attendance for the payroll. The purpose of the statement was to alert Mr. Savidge to the 12 noon time frame established by Ms. Mardes

Pursuant to Mr. Savidges' aforementioned statement I once again stated that his decision to deny my use of accrued sick leave based upon insufficient medical certification was in direct violation of the agency's stated 630-1 "sick leave" policy

Pursuant to my aforementioned opposition Mr. Savidge stating in a very abrupt and dismissive manner that "this conversation is over leave my office"

I once again request the administrative reason why he denied the use of accrued sick leave when I was in full compliance with the agency's sick leave policy

At this point Mr. Savidge, who was very angry and loud, stood up from his chair and positioned himself directly in my face and proceeded in an aggressive, intimidating and threatening matter telling me to leave his office

I informed Mr. Savidge that I did not appreciate the way that he was addressing me and that his behavior was "uncalled for" and unprofessional. At this point Mr. Savidge stated to Mr. Johnson "I am asking Mr. Solomon to leave my office"

Pursuant to Mr. Savidges' statement Mr. Johnson addressed me and I responded to Mr. Johnson that I was tired of the way I was always be treated by Mr. Savidge and what he was doing was totally wrong administratively

Almost momentarily Ms. Durant entered the room and addressed me by stating "Robert can you go down stairs and setup the line"

Pursuant to Ms. Durant's request I immediately returned to the snack bar and "set up the

line" for lunch and continued to perform my responsibilities until the end of my tour of duty

- On June 17, 2003 I returned to the work site and performed all my duties and responsibilities

- On June 17, 2003 at approximately 12:00 I was informed by Ms. Durant that I was to report to Mr. Porter's office

- Pursuant to Ms. Durant's instructions I immediately reported to Mr. Porter's office upon entering Mr. Porter's office I was presented a letter placing me on leave pending an investigated surrounding the incident of June 16, 2003

- Mr. Porter escorted me to my locker and the subway car


## GENUINE ISSUE OF MATERIAL FACTS

1.  Mr. Savidges' statement: "You then came to my desk, where I was sitting in my chair, and stood over me"    Response:   Mr. Johnson had returned to the office which required me to position myself closer to your desk that my prior conversation absent Mr. Johnson.  Further, when some one is seated and the other person is standing, coupled with the physical dynamics of the office there is no other way to position yourself by over the person.   In addition, you voiced no objection to this arrangement

2.  Mr. Savidges' statement: "saying that I had no right to ask for more documentation, that I needed to sign the leave request"   Response:    This statement was based upon the settled and established Human Resources Management Manual Chapter 630, Absence and Leave in direct reference to Section A. 4 Definitions and Section A.6 Mandatory Approval of Sick Leave.  Mr. Savidges' portrayal of the aforementioned statement as a "threatening statement" laced with intent is without merit when viewed in the context of the agency's 630-1 leave policy.

3.  Mr. Savidges' statement: "and that you wanted it then to take to the T&A Clerk" Response:   Once again this was solely an administrative consideration advanced by Ms. Mardes to fulfill her responsibility pursuant to a 12 noon deadline and to avoid being placed in a AWOL non pay status.  Mr. Savidges' portrayal of the aforementioned statement as a "threatening statement" laced with intent is without merit when viewed in the administrative context of Ms. Mardes directive.

4.  Mr. Savidges' statement: "arguing your points" Response: This statement should be viewed in the context of an administrative inquiry pursuant the Human Resources Management Manual Chapter 630, Absence and Leave in direct reference to Section A. 4 Definitions and Section A.6 Mandatory Approval of Sick Leave.  Further, this inquiry

should be viewed in the context of supervisory responsibility which ensures that management officials and supervisors inform "all employees ...of the policies, practices, regulations, and procedures which govern their actions, employment, or specific situations".    Mr. Savidges' portrayal of the aforementioned statement as a "threatening behavior" laced with intent is without merit when viewed in the administrative context I asked Mr. Savidge why he was applying a different administrative standard to me in direct violation of the agency's stated policy and thereby labels this interactions as "threatening" in defense of his inaction.

5.    Mr. Savidges' statement: "You became very angry, loud and aggressive while standing over me"  Response:  Mr. Savidges' portrayal of the aforementioned statement as a "threatening behavior" laced with intent is without merit and purely subjective when viewed in the context of an administrative inquiry pursuant the Human Resources Management Manual Chapter 630, Absence and Leave in direct reference to Section A. 4 Definitions and Section A.6 Mandatory Approval of Sick Leave.  In addition the aforementioned statement should be viewed in the context of supervisory responsibility which ensures that management officials and supervisors inform "all employees ...of the policies, practices, regulations, and procedures which govern their actions, employment, or specific situations".  Further, Mr. Savidge at all time during this interaction refused to address the question of why he was applying a different administrative standard to me in direct violation of the agency's stated policy and thereby labels this interactions as "threatening" in defense of his inaction.  At no time does Mr. Savidge define the terms angry, loud or aggressive or the behavior and/or threatening statements associated with such emotions in support of his allegations.  For the record at no time did I engage in any threatening behavior or make threatening statements to Mr. Savidge.  In addition,the "while standing over me" was address in number 1 above.

6.    Mr. Savidges' statement "but you took steps toward me and blocked me into a corner" Response:  This needs to be viewed in the context of the physical configuration of Mr. Savidges' office, recalling that Mr. Johnson had returned to the office which required me to position myself closer to Mr. Savidges' desk than my prior conversation absent Mr. Johnson.  Further, Mr. Savidge was seated and when he stood up he was positioned directly in my face I did not change my physical position at any time the physical dynamics of the office actually defined our physical configuration not intent.  In addition, you voiced no objection to this arrangement at the time.

7.    Mr. Savidges' statement " At this point, as Mr. Johnson was seriously considering getting a police officer"  Response: There is no way to address Mr. Johnson's intent because it is purely subjective, however the objective evidence support the fact that at no time were the Capitol Police summoned. In addition if this was a factual account the question that must be addressed is what was the charge. Further, Mr. Savidge entertained the thought of involving the Capitol Police at any time during the incident of June 16, 2003 or June 17, 2003 with issuance of the letter by Mr. Porter.  Mr. Savidges' portrayal of the

aforementioned statement as a "threatening behavior" laced with intent is without merit when viewed in the administrative context of the administrative inquiry pursuant the Human Resources Management Manual Chapter 630, Absence and Leave in direct reference to Section A. 4 Definitions and Section A.6 Mandatory Approval of Sick Leave, coupled with his documented reactions to the statements and apprehension of harm.

8.    Mr. Savidges' statement: "Ms. Durant called your name several times to get you to back away but you continued to stay in my face, blocking me in the corner"  Response: Ms. Durant entered the room and addressed me by stating "Robert can you go down stairs and setup the line" (for lunch) pursuant to Ms. Durant's request I immediately returned to the snack bar and "set up the line" for lunch and continued to perform my responsibilities until the end of my tour of duty.  Mr. Savidges' portrayal of the aforementioned statement as a "threatening behavior" laced with intent is without merit and contrary to the material facts in this "case"

Sincerely,

Robert Solomon

THE ARCHITECT OF THE CAPITOL
1793

EU 594970455US
Mailed Express Overnight and regular on 9/15/2003

Washington, DC 20515

September 15, 2003

EXPRESS MAIL -
RETURN RECEIPT REQUESTED

Mr. Robert G. Solomon, Jr.
8006 - 14th Avenue, #202
Hyattsville, MD 20783-3909

Dear Mr. Solomon:

I concur with Mr. Robert Savidge's proposal to remove you from your position of Grill Attendant with the U.S. Senate Restaurants for exhibiting hostile and threatening behavior in the work place. The specific reasons for proposing your removal were documented in Mr. Savidge's letter to you dated August 6, 2003.

I have carefully considered the information in your August 20, 2003, letter responding to the proposal to remove you.

In your response, you stated that you at no time engaged in any threatening behavior or making threatening statements to Mr. Savidge; that due to the physical dynamics of the office, there is no other way to position yourself when someone is seated and the other person is standing; and, that Ms. Durant entered the room, asked you to go downstairs and set up the line, and you immediately returned to the snack bar and set up the line for lunch.

However, you admitted that you entered Mr. Savidge's office at approximately 10:45 a.m. on June 16, 2003, and presented him with leave slips and supporting medical documentation for the period of June 9 through June 13, 2003; that you left his office at his request and returned to the snack bar to retrieve an additional document; that, upon your return, Mr. Savidge advised you that he was not approving your sick leave for June 9, 10, and 11, because your medical certification lacked a diagnosis; and, that you continued to dispute the disapproval of your sick leave, even though Mr. Savidge repeatedly told you to leave his office.

-PLAINTIFF'S EXHIBIT #10-

Mr. Robert G. Solomon, Jr.
September 15, 2003
page two

The basis of Mr. Savidge's proposal of removal is "exhibiting hostile and threatening behavior in the work place." Based on my review of your response and Mr. Savidge's proposal, I have concluded that the incident in question occurred as described by Mr. Savidge and that your response does not provide an acceptable reason for your inappropriate behavior. You were previously counseled in December, 1999, regarding behavior very similar to that exhibited by you on June 16, 2003. Employees of the Office of the Architect of the Capitol are expected to exhibit exemplary behavior at all times. Further, threatening behavior, such as intimidation in the form of oral remarks or gestures that communicate a direct or indirect threat of physical harm, cannot be tolerated in our work place. Therefore, I concur with Mr. Savidge's proposal.

You have the right to review the material on which the proposal is based. If you wish to review the material, please contact Barbara Metz, Employee Relations Specialist, at (202) 226-2549, to schedule an appointment.

You have the right to request a formal hearing before a hearing officer. If you desire a hearing, you must submit your request, within 5 work days after your receipt of this letter. Your request must be submitted in writing to the Director, Human Resources, Ford House Office Building, Room H2-295, Washington, D.C. 20515. Due to mail delays, you should personally deliver your reply or fax it to (202) 226-8880, Attention: Barbara Metz. If you do not request a formal hearing, your case record will automatically be reviewed by a hearing officer. In either case, the hearing officer will submit a report of findings and recommendation to the Architect based on the information available in the case file or at the formal hearing, if one is requested. The enclosed "Request for Hearing" may be used for this purpose.

At the hearing, you are entitled to be represented by an attorney or other representative of your choice, provided that there is no conflict of interest for the proposed representative to serve in that capacity.

To expedite the completion of this action, you may voluntarily waive your right to a hearing and a hearing officer's review, in writing, if you are willing to accept the penalty proposed in Mr. Savidge's August 6, 2003, proposal. The enclosed "Statement of Waiver" may be used for this purpose.

Mr. Robert G. Solomon, Jr.
September 15, 2003
page three

The Architect of the Capitol will make the final decision on this proposal. If the final decision of the Architect directs your removal, you will be informed of the effective date of your removal. A permanent record of such discipline will be placed in your Official Personnel Folder.

Sincerely,

Michael Marinaccio
Director of Food Services
U.S. Senate Restaurants

Enclosures

PLAINTIFF'S EXHIBIT #14

March 2000

# Administrative Hearings
## Proposed Disciplinary Actions

*A Guide for AOC Employees*

Management, Employees, and Labor Relations Branch



THE ARCHITECT OF THE CAPITOL ★1793★



The purpose of an Administrative Hearing is to allow the employee who has received a proposed disciplinary action an opportunity to present "his or her side" of what happened, including facts which the employee believes show that the proposed action is unwarranted. The AOC Personnel Manual, Chapter 752, Discipline, dated July 15, 1994, provides employees who have received proposed suspensions or removals the right to request an Administrative Hearing before a Hearing Officer. The Hearing Officer is not an AOC employee.

This Guide has been developed to provide you with important information about Administrative Hearings on proposed disciplinary actions at the Office of the Architect of the Capitol. You are encouraged to read it in its entirety.

This booklet is intended to be used as a supplement to and not in place of information directly available from your Management, Employee, and Labor Relations Branch personnel. They can be reached at 202-226-0750 to answer questions concerning your specific rights and hearing procedures.

## Notice of Hearing

You must submit your Request for Hearing to the Director of Human Resources. Then, the Human Resources Specialist assigned to your case will schedule the Hearing and notify you in writing of the date, time, and location of the Hearing. The date of the Hearing is usually three or four weeks from the date of your hearing notice, and the Hearing is generally located in the Ford House Office Building.

The hearing notice also includes specific instructions and deadlines about obtaining approval of your witnesses, and providing information on your Employee Representative.

## Requests to Postpone the Hearing

The Human Resources Director has authority to approve postponement requests. Requests may be approved for unusual circumstances, but we recommend that you submit your request to the Human Resources Director as far in advance of the scheduled hearing date as possible, and include:

• Explanation of the circumstances which prevent you from participating in the hearing on the date scheduled
• Documentation of the circumstances
• Alternate hearing dates

We suggest that requests due to medical reasons be supported by a statement from a licensed physician or other appropriate practitioner and include:

• The medical diagnosis or clinical impression
• The diagnostic criteria
• Conclusions and recommendations consistent with generally accepted medical principles and practices
• Explanation of how the medical condition impacts your ability to participate in the hearing on the date scheduled

You will be notified in writing of the decision to approve or disapprove your postponement request.

## Preparing for Your Hearing

After you have received the hearing notice, prepare for the Hearing so that you can present a good case.

At a minimum, you should:

✓ Review the material on which the proposal is based.
✓ Determine your defense(s) to the charge(s).
✓ Decide what facts you will present as reasons to modify the charge(s) or the penalty.
✓ Determine what information you will present to support your defense(s), and/or your facts.
✓ Identify witnesses who can support the information you will present.
✓ Ask the witnesses for their participation.
✓ Decide if you want someone to represent you at the Hearing, and ask for that person's participation. You may be represented by one representative of your choice.
✓ As instructed in the hearing notice, submit Witness Requests, and the name of your representative.
✓ Make a list of questions to ask both your witness and management's witnesses.
✓ Meet with your witnesses and representative, if applicable, prior to the hearing to discuss your presentation of information.
✓ Determine the order to question your witnesses.

## Format of Hearing

□ The Hearing is not a legal proceeding. The Hearing Officer makes an audiotape of the Hearing which is available upon written request, after the Hearing. Documents may be presented at the Hearing, but must be accepted by the Hearing Officer in order to be made part of the record.

□ A Hearing generally lasts no more than one day, unless the Hearing Officer determines that the time is not sufficient for a full and fair presentation of the information by both parties.

□ The Human Resources Specialist presents the case file documentation and witness statements that form the basis for the proposed disciplinary action. The Specialist should show that the proposed action is appropriate, and in compliance with AOC policy.

□ The Employee may be represented by not more than one Representative of the employee's choice, provided there is no conflict of interest. The Employee or Representative should present reason(s) to reverse or modify the proposed action.

## Roles of Hearing Participants

**Hearing Officer**
* Approves or disapproves witness requests
* Hears witness statements
* Accepts or rejects documentary information
* Determines the relevancy of information presented
* Does not tolerate disruptive or hostile conduct
* May exclude or dismiss any person who disrupts the hearing
* Asks questions of witnesses, employee, representative, and Human Resources Specialist
* Analyzes case file and hearing information
* Submits written report of finding(s) and recommendation(s) to the Architect of the Capitol

**Human Resources Specialist**
* Coordinates proposed disciplinary action
* Maintains all case file records relating to proposed discipline
* Responsible for presenting the information which supports the proposed discipline
* Advises management and employees on hearing policy, procedures, and rights
* May make opening and closing statements

---

## Roles of Hearing Participants

**Employee Representative (or Employee)**
* Presents information on behalf of Employee
* Asks witnesses and/or employee questions
* May make opening and closing statements
* In absence of a Representative, Employee may serve as his or her Representative and carry out the roles of the Representative.

**Witness(es)**
* Remains outside of the hearing room until called for questioning
* Answers all questions fully and truthfully
* Does not discuss his or her participation with others

**Employment Counsel**
* Advises Human Resources Specialist during the Hearing.

**Observers**
* The Hearing is not open to the public. Infrequently, a member of the Human Resources staff is allowed as a silent observer for training and development purposes.

## Order of the Hearing

The Hearing proceeds in four phases:

### Phase I – Introductions

The Hearing Officer:

- Starts the audio recorder
- Provides general information, guidelines and rules for the hearing
- Asks each participant to introduce himself or herself for the record

### Phase II – Opening Statements

- The Human Resources Specialist may briefly summarize the reason(s) for the proposed discipline and the information to be presented which supports the proposed action.

- The Employee or Representative may briefly summarize the employee's position and the information to be presented.

---

## Order of Hearing

### Phase III – Presentations

- The Human Resources Specialist presents case information and witness statements supporting the proposed action.

- The Employee or Representative may then question these witnesses.

- The Employee or Representative presents facts and witness statements supporting the employee's position.

- The Human Resources Specialist may question witnesses called by the Employee or Representative, and may review any documents submitted by the Employee.

### Phase IV – Closing Statements

- The Human Resources Specialist may make a closing statement summarizing what has been presented in support of the proposed action.

- The Employee or Representative may make a closing statement in response to the charges and the penalty proposed, and the information presented by the Human Resources Specialist.

10

## Hearing Officer's Recommendation

The Hearing Officer submits a report of finding(s) and recommendation(s) based on an analysis of case file information and information presented at the Hearing. The analysis is solely for the use of the Architect of the Capitol and is not available for disclosure.

The Hearing Officer's recommendation(s) is forwarded to the Architect of the Capitol for review and final decision.

## Architect of the Capitol Decision

The Architect of the Capitol reviews the information in the case file, and the finding(s) and recommendation(s) of the Hearing Officer. Based on this review, the Architect decides if the proposed penalty is appropriate.

You will be notified in writing of the Architect's decision. If the Architect decides to impose the proposed penalty or an alternative penalty, the effective dates will be included in this letter. The Architect's decision is final.

11

## Record Keeping OPF Filing

If the Architect directs the suspension or removal, documentation is maintained in your Official Personnel File (OPF) permanently.

The documentation maintained includes:

* Proposal letter
* Concurrence letter
* Decision letter from the Architect of the Capitol



Management, Employee, and Labor Relations
Branch

Ford House Office Building
Room 293
202-226-0750



EU 594844262 US

*Express and
regular mail
- 12/29/03
Rec'd by
Re 12/30/03*

Washington, DC 20515

December 22, 2003

EXPRESS MAIL -
RETURN RECEIPT REQUESTED

Mr. Robert G. Solomon, Jr.
8006 - 14th Avenue, #202
Hyattsville, MD 20783-3909

Dear Mr. Solomon:

This is to notify you of my final decision on the proposal to remove you from your position of Grill Attendant with the U.S. Senate Restaurants for exhibiting hostile and threatening behavior in the work place. The specific details were provided to you in Mr. Robert Savidge's letter to you dated August 6, 2003.

In accordance with the Architect of the Capitol Human Resources Manual, Chapter 752, the proposal to remove you, concurred in by Mr. Michael Marinaccio, Director of Food Services, U.S. Senate Restaurants, was referred to a hearing officer for a formal hearing, pursuant to your request. The hearing was held on November 21 and November 24, 2003.

I have reviewed your case and based my final decision on the reasons specified in the letters proposing and concurring with the action, your response thereto, information presented at the hearing, and the findings and recommendation of the hearing officer. I have decided that your employment shall be terminated effective at the close of business on December 29, 2003.

A permanent record of this discipline shall be placed in your Official Personnel Folder.

Sincerely,

Richard E. McSeveney, P.E.
Chief Operating Officer

_PLAINTIFF'S EXHIBIT #15_



**Washington, DC 20515**

received May 3rd 2004

April 28, 2004

Mr. Robert Solomon
8006 14th Avenue, #202
Hyattsville, MD 20783

Dear Mr. Solomon:

This is in response to your March 19, 2004, letter to Mr. Alan M. Hantman, Architect of the Capitol, a copy of which was also sent to my attention. In that letter you request a copy of the "Finding(s) and Recommendations(s)" of Hearing Officer Gloria Johnson pertaining to your disciplinary hearing held November 21 and 24, 2003. As was explained in Mr. Hantman's March 8, 2004, letter to Senator Barbara Mikulski responding to her inquiry on your behalf which included an identical request, the document that you are requesting is an internal management document and is not available for disclosure. Therefore, your request for a copy is denied.

Sincerely,

Richard A. McSeveney
Chief Operating Officer

- PLAINTIFF'S EXHIBIT #13 -

24 FLRA No. 82

<div align="center">

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL LABOR RELATIONS AUTHORITY
WASHINGTON, D.C.

</div>

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

_ PLAINTIFF'S EXHIBIT #14 _

Respondent

and                                    Case No. 3-CA-50243

EDGARD MARTINEZ

Charging Party/Individual

<div align="center">

DECISION AND ORDER

</div>

I.    Statement of the Case

This unfair labor practice case is before the Authority
on exceptions to the attached decision of the Administrative
Law Judge filed by the Respondent.  The General Counsel filed
an opposition to the exceptions.  The complaint alleged that
the Respondent violated sections 7116(a)(1) and (2) of the
Statute by discharging an employee because of his activity in
filing grievances.  Additionally, the complaint alleged that
the Respondent committed an independent violation of 7116(a)
(1) by alluding to the employee's grievances in a Notice of
Proposal to Remove to support a charge of disruptive and
unprofessional conduct.  In disagreement with the Judge we
find that the Respondent did not violate the Statute in
discharging the employee.  However, we find that the Res-
pondent did violate section 7116(a)(1) by alluding to the
employee's grievances as support for the action in the Notice.

II.    Background Facts

As the pertinent facts of this case are fully set forth
in the Judge's Decision, they will be discussed only briefly.
During the summer of 1984, the employee, Martinez, became con-
cerned about changes made by management in the manner in which
he was required to perform his duties.  In reaction to these
changes, Martinez filed four grievances under the applicable
negotiated grievance procedure.  The first grievance was
initiated on July 13, 1984, and the fourth grievance was
initiated on September 25, 1984.  All of the grievances were
denied by the Respondent with the last decision issuing on
October 11, 1984.

Martinez received a "Notice of Proposal to Remove" on October 12 and submitted a formal response on October 24. On October 26 Martinez as notified of the Respondent's decision to remove him effective November 2, 1984. As more fully set forth in the Judge's decision, Respondent noted in essence in taking such action that:

> (1) Martinez had promoted racial strife among the staff and management in the Office of Review and Appeals by informing a former co-worker that he received his promotion only because he is white, by encouraging a black employee to file an EEO complaint regarding her non-selection for the same promotion, and by making allegations that white employees have received more difficult case assignments.

> (2) Martinez had demonstrated disruptive, unprofessional conduct and made himself extremely difficult to supervise by seldom accepting assignments or taking directions without challenging authority. A written reprimand issued September 10, 1984, stated that in objecting to a priority assignment, Martinez flew into a rage, slammed the file on his desk, yelled at his supervisor so loudly that he was heard clearly several offices away, and refused to do more work (Tr 418-19, 425). In addition, the written reprimand referred to other specific incidents of disrespect and hostile conduct occurring early in September as well as previous incidents. The concluding paragraph of the reprimand stated: "[T]his hostile conduct of jumping to conclusions, making unfounded accusations, and consistently questioning direct supervisory instructions cannot be condoned." The Respondent also contended that Martinez abused the grievance process by continuing to demand information and submitting numerous memoranda necessitating interim answers on his pending grievances which occupied his supervisor's work time and prevented her from processing the cases submitted to her for approval.

852

(3) Martinez had maintained a hostile attitude
in dealings with management as demonstrated by
his continuing failure to accept assignments or
take direction without requiring the direction
to be in writing, with specific instructions on
how to deal with cases, by making untrue alle-
gations at a general staff meeting that manage-
ment assigned him almost nothing but merit
cases, and by being extremely abusive, loud
and disrespectful toward the Director in public
on one occasion.

See Administrative Law Judge's Decision, at 5-7.

III.  Administrative Law Judge's Decision

The Judge found that Martinez had made various remarks
to employees and management officials attributed to him in
the Notice of Proposal to Remove.  The Judge further con-
cluded, however, that although the Respondent was well aware
of Martinez's objectionable conduct during the April-September
1984 period, no formal discipline of any kind was imposed
until September 10, 1984, when he received a written
reprimand for insubordinate conduct in connection with his
handling of a priority case assignment.  The Judge found that
while his supervisor claimed to have counseled Martinez con-
cerning his attitude, she had done no more than indicate her
displeasure on a number of occasions when Martinez displayed
what she considered unacceptable behavior.  The Judge found
it significant that the supervisor did not enter any nota-
tions of her counseling in his personnel file.  The Judge
noted that only after Martinez began to file the grievances
did Respondent begin to investigate and collect statements
from employees involved in the incidents used to establish a
basis for charging Martinez with unacceptable conduct.  Re-
garding Martinez's alleged abuse of the grievance procedure,
the Judge found that Martinez's actions in actively pursuing
his grievances by seeking information and interim answers to
questions concerning his grievances did not exceed the ambit
of protected activity.  In view of the above, the Judge found
it unnecessary to reach the alleged independent violation of
section 7116(a)(1) contained in the complaint.

IV.  Position of the Parties

The Respondent's exceptions challenge the Judge's
findings regarding its motives in discharging Martinez and
the Judge's recommended Order reinstating Martinez.  Essen-
tially, Respondent reiterates the same arguments it presented
at the hearing regarding its motivation and the basis for its

decision to terminate Martinez. The Respondent contends that
Martinez's methods of pursuing his grievances were not pro-
tected under the Statute. The Respondent argues that Martinez
used the grievance procedure to create disruptions, tension
and suspicion in the workplace, and as leverage in an attempt
to prevent management from performing its legitimate
functions and duties. For example, the Respondent alleges
that Martinez's continuous demands for information regarding
his grievances created a burden which unduly prevented
management officials from accomplishing other work. The
Respondent further contends that it would have discharged
Martinez even if he had not filed grievances and actively
pursued them under the negotiated grievance procedure. At
the time of his removal, the Respondent contends that
Martinez was failing to perform his work in a satisfactory
manner, had fomented discontent, and had engaged in an ever
increasing pattern of unacceptable behavior toward his fellow
employees and supervisors which had an adverse effect on the
operation of his section. Accordingly, the Respondent argues
that no violation of the Statute occurred and that the remedy
recommended by the Judge, that Martinez be reinstated and
made whole, is inappropriate and unjustified by the record.

    The General Counsel, in its opposition to Respondent's
exceptions, supports the findings of the Judge that the pri-
mary reason for Martinez's discharge was not his performance
or conduct as an employee, but retaliation for his filing and
actively pursuing grievances under the negotiated procedure.
The General Counsel supports the Judge's conclusion that
Respondent by its conduct violated section 7116(a)(1) and (2)
of the Statute. Moreover, the General Counsel urges the
Authority to find that Respondent independently violated
section 7116(a)(1) of the Statute by including as a basis for
termination in the Notice of Proposal to Remove the filing of
grievances.

V.    Analysis

    A.    Termination of Martinez

    The Respondent's exceptions raise two defenses. First,
Respondent argues that Martinez was not discharged for having
engaged in protected activity since the charges relating to
his conduct in pursuing his grievances under the negotiated
procedure did not involve conduct that was protected under the
Statute. The Respondent also contends that it would have re-
moved Martinez, notwithstanding the conduct relating to his
grievances, based on the other conduct contained in the Notice
of Proposal to Remove.

854

(1)  <u>Active Pursuit of Grievance is Protected
     Activity</u>

Section 7116(a)(1) of the Statute provides that it is
an unfair labor practice for an agency to interfere with, res-
train, or coerce any employee in the exercise by the employee
of any right under the Statute.  It is well established that
an employee's right to file and process grievances under a
collective bargaining agreement is protected activity within
the meaning of section 7102 of the Statute and that manage-
ment's actions which tend to interfere with or restrain the
exercise of such rights constitutes unlawful interference in
violation of section 7116(a)(1).  <u>Internal Revenue Service
and Brooklyn District Office</u>, 6 FLRA 642 (1981).  Noting
particularly that the Respondent's contention that Martinez
abused the grievance process was based on the fact that
Martinez continued to demand information and submitted
numerous memoranda necessitating interim answers on his
pending grievances, we agree with the Judge's finding that
Martinez's action in actively pursuing his grievances did not
exceed the ambit of protected activity.

(2)  <u>Termination Based on Mixed Motive</u>

With regard to Respondent's second defense, that
Martinez would have been removed for other reasons not with-
standing his conduct related to his grievances, the Authority
in <u>Internal Revenue Service, Washington, D.C.</u>, 6 FLRA 96
(1981) enunciated a test for determining whether a violation
of the Statute has been committed in such mixed motive situa-
tions.  Under that test the burden is on the General Counsel
to make a <u>prima facie</u> showing that the employee had engaged
in protected activity and that this conduct was a motivating
factor in an agency's decision to act against the employee.
If and when a <u>prima facie</u> case is established, the Respon-
dent then has to show by a preponderance of the evidence that
it would have reached the same decision in the absence of the
protected conduct.

In its Notice of Proposal to Remove, the Respondent in
this case concluded based on specific incidents credited by
the Judge:

(1) that Martinez had promoted racial strife
    among the staff and management in the Office
    of Review and Appeals;

855

(2) that he had been disruptive and unpro-
fessional in his conduct with management
officials and fellow employees; and

(3) that he had a hostile attitude and manner
of dealing with management.

Among the incidents relied on to support the above con-
clusions, the Respondent asserted that Martinez abused the
grievance process by demanding information and submitting
numerous memoranda concerning his grievances which prevented
his supervisor from working on other matters. However, the
main theme running through the Notice as well as the written
reprimand of September 10, is the Respondent's conclusion
that Martinez had established a pattern of misconduct that
was incompatible with his position as a General Attorney in
the Appeals Division of the Equal Employment Opportunity
Commission's Office of Review and Appeals.

In agreement with the Judge, we conclude based on the
Notice of Proposal to Remove and the testimony credited by
the Judge that the General Counsel established that the
employee engaged in protected activity and that such
activity was a motivating factor in the decision to remove
him. We further find, in disagreement with the Judge, that
the Respondent established that it would have reached the
same decision even in the absence of the protected conduct.
It is clear from the incidents credited by the Judge that
the termination of Martinez was based on a pattern of dis-
ruptive, unprofessional conduct creating an atmosphere of
racial strife among staff and management in the office which
finally culminated in a written reprimand and the subsequent
Notice of Proposal to Remove. The written reprimand referred
to three incidents by date and other incidents by reference
where Martinez's conduct showed disrespect and undermined
the authority of his supervisor. As an example of this type
of conduct, the Judge credited the fact in one incident that
Martinez, in objecting to a priority assignment, flew into a
rage, slammed the file on the desk, yelled at his supervisor
so loudly that it was heard clearly several offices away and
refused to do more work. In the written reprimand that
followed, the supervisor stated specifically:

856

I have ignored previous incidents of similar
behavior hoping that after my prior requests,
your behavior would change.  I cannot any longer
continue to do so, since this pattern of behav-
ior is affecting the normal functions of this
office.  Your tone and content of your comments
are a personal attack on my functions and the
integrity of other supervisors.  This conduct
of jumping to conclusions, making unfound
accusations, and consistently questioning
direct supervisory instructions cannot be
condoned.

    In our view, the pattern of misconduct described in
the Notice and credited by the Judge, standing alone, is suf-
ficient to support the Respondent's discharge of Martinez.
Unlike the Judge, we do not ascribe any adverse inference to
the fact that Martinez's supervisor initially attempted to
correct his behavior verbally and not place anything in writ-
ing in his record.  Only when informal efforts failed and
Martinez's conduct became progressively worse did she issue
a written reprimand and subsequently participate in the pre-
paration of the Notice of Proposal to Remove.  We also do
not ascribe any adverse inference to the fact that the Res-
pondent obtained statements concerning Martinez's improper
conduct prior to issuing the Notice of Proposal to Remove.
To do otherwise would have been irresponsible and inadequate
personnel work.  We find that a preponderance of the evi-
dence establishes that Respondent, even in the absence of
Martinez's protected activity, would have removed him be-
cause of the pattern of misconduct described.  Accordingly,
we conclude that the Respondent by its actions in terminat-
ing Martinez did not violate the Statute as alleged in the
complaint and we shall order that portion of the complaint
be dismissed.  See Internal Revenue Service, Washington,
D.C. and National Treasury Employees Union, 6 FLRA 96 (1981).

    B.    Martinez's Grievances as a Basis for Termination
          in Notice of Proposal to Remove

    The complaint also alleged that Respondent indepen-
dently violated section 7116(a)(1) of the Statute by includ-
ing as a basis for termination in the Notice of Proposal to
Remove the processing of Martinez's grievances.  We disagree
with the Judge's determination that it is unnecessary to
reach this allegation.  As we previously found that the
filing and active pursuit of these grievances were protected

under the Statute, we view the inclusion in the Notice of
Proposal to Remove of remarks concerning grievances filed by
Martinez as an infringement upon the exercise of Martinez's
protected rights under section 7102 of the Statute.  See
U.S. Department of Interior, Office of the Secretary, U.S.
Government Comptroller for the Virgin Islands, 11 FLRA 521
(1983).  Accordingly, by including references to Martinez's
filing and active pursuit of his grievances as a basis for
termination in the Notice of Proposal to Remove, Respondent
violated section 7116(a)(1) of the Statute.

## VI.   Conclusion

Pursuant to section 2423.29 of the Authority's Rules
and Regulations and section 7118 of the Statute, we have
reviewed the rulings of the Judge made at the hearing, find
that no prejudicial error was committed, and affirm those
rulings.  We have considered the Judge's Decision and the
entire record, and contrary to the Judge we conclude as
found above that the Respondent did not violate the Statute
as alleged in the complaint by the termination of Martinez
and shall dismiss that portion of the complaint.  However,
we find that by including Martinez's filing and processing
of his grievances as a basis for termination in the Notice
of Proposal to Remove, Respondent violated section
7116(a)(1) of the Statute.

### ORDER

Pursuant to section 2423.29 of the Federal Labor Rela-
tions Authority's Rules and Regulations and section 7118 of
the Statute, it is hereby ordered that the Equal Employment
Opportunity Commission shall:

1.  Cease and desist from:

(a) Including in the Notice of Proposal to Remove
Edgard Martinez dated October 12, 1984, any adverse com-
ment concerning the right to file and process grievances
under the contractual grievance procedure.

(b) In any like or related manner interfering with,
restraining, or coercing employees in the exercise of their
rights guaranteed by the Statute.

2.  Take the following affirmative actions in order to
effectuate the purposes and policies of the Statute:

(a) Upon request, delete from the Notice of Proposal to Remove Edgard Martinez dated October 12, 1984, any adverse reference to the filing and processing of grievances filed by Martinez under the contractual grievance procedure.

(b) Post at its Baileys Crossroads, Virginia Office, copies of the attached notice on forms to be furnished by the Federal Labor Relations Authority. Upon receipt of such forms, they shall be signed by the Chairman, and shall be posted and maintained for 60 consecutive days thereafter in conspicuous places, including all bulletin boards and other places where notices to employees are customarily posted. Reasonable steps shall be taken to insure that such notices are not altered, defaced, or covered by any other material.

(c) Pursuant to section 2423.30 of the Authority's Rules and Regulations, notify the Regional Director, Region III, Federal Labor Relations Authority, 1111 18th Street, NW., 7th Floor, P.O. Box 33758, Washington, D.C. 20033-0758, in writing, within 30 days from the date of this Order, as to what steps have been taken to comply herewith.

It is further ordered that the remaining allegation of the complaint in Case No. 3-CA-50243 pertaining to the discharge of Edgard Martinez is dismissed.

Issued, Washington, D.C., December 29, 1986.


Jerry L. Calhoun,                    Chairman


Henry B. Frazier III,                Member


Jean McKee,                          Member

FEDERAL LABOR RELATIONS AUTHORITY


859

NOTICE TO ALL EMPLOYEES

PURSUANT TO

A DECISION AND ORDER OF THE

FEDERAL LABOR RELATIONS AUTHORITY

AND IN ORDER TO EFFECTUATE THE POLICIES OF

CHAPTER 71 OF TITLE 5 OF THE

UNITED STATES CODE

FEDERAL SERVICE LABOR-MANAGEMENT RELATIONS

WE HEREBY NOTIFY OUR EMPLOYEES THAT:

WE WILL NOT include in the Notice of Proposal to Remove Edgard Martinez dated October 12, 1984, any adverse comment concerning the right to file and process grievances under the contractual grievance procedure.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce our employees in the exercise of their rights assured by the Federal Service Labor-Management Relations Statute.

WE WILL, upon request, delete from the Notice of Proposal to Remove Edgard Martinez any adverse reference to the filing and processing of grievances filed by Martinez under the contractual grievance procedure.

_____
(Agency)

Dated:_____By: _____
(Signature)    (Title)

This Notice must remain posted for 60 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material. If employees have any questions concerning this Notice or compliance with its provisions, they may communicate directly with the Regional Director, Region III, whose address is: 1111 18th Street, NW., 7th Floor, P.O. Box 33758, Washington, D.C. 20033-0758 and whose telephone number is: (202) 653-8500.

UNITED STATES OF AMERICA
FEDERAL LABOR RELATIONS AUTHORITY
OFFICE OF ADMINISTRATIVE LAW JUDGES
WASHINGTON, D.C.  20424


. . . . . . . . . . . . . . . . . .
                                              .
EQUAL EMPLOYMENT OPPORTUNITY                  .
COMMISSION                                    .
                                              .
          Respondent                          .
                                              .
     and                                      .          Case No. 3-CA-50243
                                              .
EDGARD MARTINEZ                               .
                                              .
          Charging Party/Individual           .
                                              .
. . . . . . . . . . . . . . . . . .

Erica F. Cooper, Esquire
Bruce D. Rosenstein, Esquire
     For the General Counsel

Frederick W. Ford, Esquire
Calvin Washington, Esquire
     For the Respondent

Before:  BURTON S. STERNBURG
         Administrative Law Judge


DECISION

Statement of the Case

   This is a proceeding under the Federal Service Labor-Management
Relations Statute, Chapter 71 of Title 5 of the U.S. Code, 5 U.S.C.
Section 7101 et seq., and the Rules and Regulations issued thereunder.

   Pursuant to an amended charge first filed on March 26, 1985 by Edgard
R. Martinez, an individual, a Complaint and Notice of Hearing was issued
on June 21, 1985, by the Regional Director for Region III, Federal Labor
Relations Authority, Washington, D.C.  The Complaint alleges that the
Equal Employment Opportunity Commission, (hereinafter called the
Respondent or EEOC), violated Sections 7116(a)(1) and (2) of the Federal
Service Labor-Management Relations Statute, (hereinafter called the
Statute), by discharging Mr. Martinez because of his participation in
activities protected by the Statute, namely, filing grievances.  It is

further alleged that Respondent committed an independent violation of Section 7116(a)(1) by alluding to Mr. Martinez' protected activity as a basis for his removal in the formal "Notice of Proposal to Remove".

A hearing was held in the captioned matter on August 6 and 7, 1985, in Washington, D.C. All parties were afforded the full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence bearing on the issues involved herein. The General Counsel and the Respondent submitted post-hearing briefs on September 23,1985,1/ which have been duly considered.2/

Upon the basis of the entire record, including my observation of the witnesses and their demeanor, I make the following findings of fact, conclusions, and recommendations.

## Findings of Fact

At all times material herein, the American Federation of Government Employees, AFL-CIO, Council 216 has been the exclusive representative of a unit of Respondent's professional employees, including attorneys. At all times material herein, the Union and Respondent have been parties to a collective-bargaining agreement which includes a negotiated procedure for the processing of grievances. Under that agreement, an employee may process a grievance through the negotiated grievance procedure as an individual and without union representation.

On July 1, 1979, Mr. Martinez was hired as a General Attorney in the Appeals Division of Respondent's Office of Review and Appeals. Mr. Martinez remained in that position, located at Respondent's Baileys Crossroads, Virginia location until November 2, 1984. For two to three weeks prior to his removal, which was effective November 2, 1984, Mr. Martinez' immediate supervisor was Mr. Gary Hozempa. Immediately prior to that, from January 1984 to October 1984, Ms. Hilda Rodriguez held the position of Supervisory Attorney and was Mr. Martinez' immediate supervisor. Ms. Rodriguez, as Supervisory Attorney reported directly to Mr. Robbie Dix, III, Director, Division of Appeals. Mr. Dix, in turn, reported to Ms. Delores Rozzi, Director of the Office of Review and Appeals (ORA).

During the summer of 1984, Mr. Martinez became concerned about changes made by ORA management in the method of performing his work. One such

---

1/ Respondent on November 1, 1985 moved to file a Supplemental Post-Hearing Brief. In the absence of any objection, the brief has been received and considered.

2/ In the absence of any objection, the General Counsel's Motion to Correct Transcript, is hereby granted.

change involved the imposition of clerical duties on attorneys as part of their official duties. Another change concerned attorney access to the office word processing equipment in the preparation of their draft decisions. A third change required attorneys to proofread not only their own work, but work of other attorneys. Other changes affecting Mr. Martinez were the manner of prioritizing case work assigned to attorneys and the fluctuation of case production numbers required of attorneys.

In response to the above changes, Mr. Martinez filed four grievances under the applicable collective-bargaining agreement. Mr. Martinez filed the first grievance concerning the use of word processing equipment informally with Ms. Rodriguez on July 13, 1984. After no resolution was reached, on July 27, 1984, Mr. Martinez elevated that grievance to the next level to Office Director Rozzi. Ms. Rozzi denied the grievance on August 2, 1984. Thereafter, Mr. Martinez elevated the grievance on August 3, 1984 to the third level with Respondent's Chairman Clarence Thomas. Chairman Thomas denied that grievance on September 27, 1984.

On August 3, 1984, Mr. Martinez filed a second grievance at the first level with Ms. Rodriguez concerning what he considered the imposition of clerical duties on attorneys. Additionally, in the grievance, he sought responses to memoranda written by Mr. Martinez on June 25, 1984 and June 27, 1984 to management requesting specific information on attorney production requirements. Ms. Rodriguez responded on August 10, 1984, denying his grievance. Mr. Martinez again followed the procedure set forth in the collective-bargaining agreement and appealed the denial to Ms. Rozzi on August 16, 1984. Ms. Rozzi denied the grievance on August 23, 1984 which Mr. Martinez promptly raised to the third level with the Chairman on August 24, 1984. The Chairman denied the grievance on September 27, 1984.

Mr. Martinez filed a third grievance at the step one level with Ms. Rodriguez on August 29, 1984. The third grievance concerned a dispute surrounding the assignment of a particular priority case, the imposition of proofreading duties on attorneys, and production requirements as set forth in an August 28, 1984 memorandum from Ms. Rodriguez. After receiving Ms. Rodriguez' first step denial on September 4, 1984, Mr. Martinez elevated the grievance to Ms. Rozzi at the second step on September 10, 1984. Ms. Rozzi did not respond to the grievance at the second step, and thereafter Mr. Martinez elevated the grievance to the Chairman's level. In conjunction with that grievance, Mr. Martinez submitted a memorandum dated September 25, 1984 to the Chairman and all of Respondent's Commissioners addressing his positive contributions to the Commission and suggesting possible ways of improving operations in ORA. Although Mr. Martinez received no response to his September 25, 1984 memorandum, Chairman Thomas denied the grievance on November 30, 1984.

By memorandum dated September 4, 1984, Mr. Martinez requested an adjustment of his productivity requirements. On September 25, 1984, Mr. Martinez filed a first step grievance based on the lack of response to his

863

Case 9700-CV-02219-RCL    Document 98-11    Filed 10/13/2007    Page 14 of 22

September 4, 1984 memorandum. The grievance was denied by Ms. Rodriguez on the same day. Mr. Martinez appealed that denial to Ms. Rozzi who on September 28, 1984 informed Mr. Martinez that in accordance with instructions from Respondent's Labor Relations Office, the appropriate second step grievance level was the Division Director, rather than the Office Director and consequently forwarded the grievance to Robbie Dix, III for response.

A second step grievance meeting was held on October 1, 1984 on the grievance. In attendance were Mr. Martinez, Chief Steward Diane Amos and Mr. Dix. On October 3, 1984, Mr. Dix denied the grievance at the step two level. Mr. Martinez appealed to Ms. Rozzi on October 9, 1984. Ms. Rozzi denied the appeal on October 11, 1984.

On October 12, 1984, Mr. Martinez attended a meeting in Division Director Dix's office, and received a "Notice of Proposal to Remove" him from his position in ORA for unacceptable and unprofessional conduct. Present at that meeting were Mr. Dix, Chief Steward Diane Amos, Mr. Rick Reda, Acting Director of ORA Administration, and Mr. Martinez. After reviewing the Notice, Ms. Amos objected to its contents on the basis that the incidents listed therein were not specific enough to allow Mr. Martinez to adequately respond to the Notice and that the Notice did not conform to the requirements of the collective-bargaining agreement as to the timeliness of the allegations. Ms. Amos asked both Ms. Rodriguez and Mr. Dix for more specifics. Mr. Dix stated that Ms. Amos would have to get any specifics from Office Director Rozzi. Ms. Amos received a memorandum dated October 22, 1984 from Ms. Rozzi denying her request for further clarification of the Notice. Ms. Amos made a formal response to the Notice of Proposal to Remove by letter of October 24, 1984, in which she stated her objections to the form and content of the Notice.

Three days after receiving the Notice of Proposal to Remove, on October 15, 1984, Mr. Martinez received his annual performance appraisal for the period October 1, 1983 to September 30, 1984. Attached to that appraisal was an Individual Development Plan for those areas in which Mr. Martinez had been found to be deficient. The Plan, drafted in accordance with EEOC Order 542, was designed to provide Mr. Martinez with 90 days to improve both the quality of his work and his conduct.

Shortly thereafter on October 26, 1984 at 9:00 p.m., a private process server delivered two documents to Mr. Martinez at his home: A Notice of Removal dated October 26, 1984 and a memorandum from Delores Rozzi directing Mr. Martinez to call his then supervisor Mr. Hozempa to arrange for an inventory of case files and government property, and placing him on administrative leave until the effective date of his removal, November 2, 1984.

864

Respondent assigned the following reasons for its proposed action.

"1.  You have demonstrated a course of conduct which has created an atmosphere of racial strife among the staff and management in the Office of Review and Appeals.

2.  You have been disruptive and unprofessional in your conduct with management officials both inside and outside your chain of command, as well as with your co-workers.

3.  You have been hostile in your attitude and dealings with management, and your conduct has rendered you ineffective in your relations with the staff and management of the Office of Review and Appeals.

While some of the incidents enumerated below took place more than 60 days ago, they clearly demonstrate a continuous behavioral pattern.  The specific instances of unacceptable and unprofessional conduct listed above on which this proposed action to remove you are based are as follows:

REASON  - 1.  Conduct which has created an atmosphere of racial strife among staff and management of the Office of Review and Appeals.

INCIDENTS  - 1 a.  The function of the Office of Review and Appeals is quasi-judicial in nature.  It requires that its employees maintain the highest standards of conduct, especially since they have a responsibility to maintain an impartial, objective point of view in the work they conduct.  Your comments to a former co-worker regarding his promotion to management, that he received this promotion only because he is white, reflect poor judgement on your part, violate those standards, jeopardizes your impartiality, creates the appearance of inefficiency, and adversely affects the operation of this Office.  You also told this employee that black employees in the office agreed and stated that his race was the reason for his selection.  To create a situation fostering racial strife in any office is clearly improper.  To do so in an Office such as Review and Appeals is unacceptable.

1 c.  You then encouraged a black employee to file an EEO complaint regarding his non-selection for this same promotion.  You stated to this employee that he had a good case.  This type of behavior is divisive, and generates racial tension and suspicion, by putting black and white employees against one another.  This conduct cannot be permitted to exist in any work place, and is especially unacceptable in this Office.

1 d.  You have also stated to your supervisor and to other staff members that white employees have received more difficult case assignments, when you would have no factual data on which to base such comments.  Furthermore, in displays of emotional outbursts, you have repeatedly accused the Office management, without any foundation

865

whatsoever, of discriminating against white males in the daily operation of this Office. In making such unfounded allegations, you have created an atmosphere of racial tension and suspicion.

1 e.  The above actions have rendered you totally ineffective in your dealings with supervisors and managers in this Office, as well as with your co-workers.  Your behavior has been so disruptive that you have created racial strife in the work place; many of your co-workers do not want to deal with you for fear that anything said will be used to create further strife and disruption.

REASON - 2.  Disruptive and unprofessional conduct.

INCIDENT - 2 a.  You have demonstrated repeatedly that you are extremely difficult to supervise; you seldom accept assignments or take direction without challenging authority, e.g., your objections at receiving a priority assignment - 05-84-0190.  You have also responded to directions to proofread your decisions with the objection that it is not your job, even though this is clearly stated in your performance standards.

2 b.  You stated to the Federal Liaison Officer when you learned that he was not with the management team on the Los Angeles trip that he "must be on the shit list, too."

2 c.  You made comments to the Director of Compliance and Control Division which were derogatory in nature regarding the promotion of two employees into management.

2 d.  After the selection of another Commission employee from another office to a management position in this Office, you called him on at least three occasions, telling him of your grievances, and you alluded to an EEO complaint.  There is a strong implication that if he became your supervisor and took any kind of disciplinary action against you, you could allege retaliation.  As a result, this employee declined to accept the position, thereby causing undue hardship on this Office.  This delayed the filling of this position, and has delayed the implementation of this Office's quality assurance program.

2 e.  Management recognizes the right of employees to avail themselves of the grievance process and to bring matters of concern to the appropriate management officials.  However, you have clearly abused this process by using this mechanism to create disruptions among employees and management, and creating tension and suspicion.  You have used the grievance procedure as a threat and as leverage to attempt to prevent management from performing its legitimate functions and duties.  As a result you have further made yourself ineffective in your relations with other employees and management.

866

REASON - 3.  Hostile attitude in your dealings with management.

INCIDENT - 3 a.  As referenced above at 2 a., you have demonstrated and extremely hostile attitude toward your supervisor when you have been assigned cases.  In a general staff meeting you alleged that you have been assigned almost nothing but merit cases, and accused management of assigning easier cases to the employees in the Review Division.  This accusation was completely unfounded.  A subsequent review of the cases you have submitted for approval at that time revealed that 77% were procedural cases.  Your comments at this meeting only served to create dissension among the staff and hostility towards management.

3 b.  You have continuously failed to accept assignments or take direction without requiring the direction to be in writing, with specific instructions on how to deal with cases, thereby requiring an inordinate amount of supervisory time at the expense of other members of the unit (e.g., the Quinones and Dillard cases).

3 c.  You have continuously written memos which make the same requests or seek the same guidance, and require excessive amounts of time to respond.  This has had an adverse impact on time to review cases.  As a result productivity has been impaired, and the overall Office productivity has suffered as well as the individual productivity of other members of the unit, whose cases have not been reviewed (e.g., your constant requests for modifications to your GPAD standards).

3 d.  You continuously present a hostile and uncooperative attitude towards management, e.g., during a luncheon with the Office Director, the attorneys in your unit, and your supervisor, you were extremely abusive, loud and disrespectful towards the Director, so much so that your supervisor and other members of the staff later apologized to the Director for your behavior.  Furthermore, despite several counselling discussions with your supervisor, your conduct toward management continued to deteriorate to the point that you were then issued a written admonishment.  All of your supervisor's efforts to get you to modify and improve your conduct have proven to be unsuccessful.

3 e.  Since January, 1984, your supervisor has made repeated attempts to provide you with proper direction and guidance.  You have been admonished by her and by your Division Director regarding your conduct and behavior on several occasions.  In January, 1984, you were placed on a performance improvement plan, which addressed the quality of your work. Within two months, you were taken off the plan because the quality improved.  However, your quality has again deteriorated.  It is evident that your hostile attitude and behavior has not only adversely impacted on your relations with the staff and management, but on your own work as well."

867

Case 1:06-cv-02214-RCL    Document 116    Filed 06/13/2007    Page 15 of 22

With regard to the "incidents" relied upon in the Notice of Removal, Respondent produced numerous witnesses at the hearing who credibly testified without contradiction that "incidents" cited in the Mr. Martinez' Notice of Removal did in fact occur.3/

With respect to the remarks made to various employees and/or management representatives concerning promotions and work assignments based on racial preference, the record reveals that such remarks were made in private conversations with the particular individuals involved.

The record further reveals that although Respondent was well aware of Mr. Martinez' objectionable conduct which occurred during the period of April-September 1984, no formal discipline of any kind was imposed upon Mr. Martinez until September 10, 1984, when he received a Formal Written Admonishment from his immediate supervisor, Hilda Rodriguez for insubordinate conduct in connection with his handling of a priority case assignment.4/ Although Ms. Rodriguez testified that she had counseled Mr. Martinez concerning his attitude, etc., upon further questioning it was disclosed that at most she had indicated her displeasure at his attitude and actions on a number of occasions when he displayed what she considered unacceptable behavior. No notations of her displeasure were ever entered in Mr. Martinez' personnel file.

With respect to incident 2 e in the Notice of Removal, wherein reference is made to Mr. Martinez' abuse of the grievance process, both Ms. Rodriguez and Ms. Rozzi similarly testified that Mr. Martinez was never satisfied with merely filing a grievance and awaiting Respondent's action thereon. Rather Mr. Martinez continued to demand information and submit numerous memoranda necessitating interim answers on the pending grievances which occupied Ms. Rodriguez' work time and prevented her from processing the cases submitted to her for approval.

Additionally, Ms. Rozzi testified that Mr. Martinez abused the grievance process by informing a potential supervisor, Michael Baldonado, who was occupying another position with EEOC at the time about his pending grievances.5/ Mr. Baldonado, who had been a former co-workers of Mr.

---

3/ Michael Baldonado, Hilda Rodriguez, Robbie Dix, Dolores Rozzi, Gary Hozempa, C. Lloyd Buddo, Roscoe Elkins, Ronald Holmes and Josephine Trevathan.

4/ The assignment of priority cases was the subject matter of Mr. Martinez' August 29, 1984 grievance.

5/ According to Ms. Rozzi, Mr. Martinez' action with respect to Mr. Baldonado was like "frosting on the cake" and considering Mr. Martinez' past indiscretions, she decided it was time to remove him.

Martinez, subsequently declined the position. Mr. Baldonado testified
that he was uncomfortable with the information because he felt that
knowledge of the grievances could be imputed to him if he became a
supervisor and thereby inhibit him in his dealings with the employees
under his supervision. Mr. Baldonado further testified that although he
was uncomfortable with the information imparted to him by Mr. Martinez, it
was not the reason that he subsequently refused to accept the supervisory
position. Thus, he pointed out that the position was that of an acting
supervisor and there was no guarantee that he would ultimately be made a
permanent supervisor.

The record further reveals that Mr. Martinez and Ms. Rodriguez were
both of Puerto Rican ancestry and had been co-workers prior to Ms.
Rodriguez' elevation to a supervisory position. Because of their ancestry
and former association their relationship appears to have been much less
formal that which usually exists between a supervisor and a subordinate.

## Discussion and Conclusions

The General Counsel takes the position that the sole reason for Mr.
Martinez' discharge was his participation in activities protected by the
Statute, namely the filing of grievances under the negotiated grievance
procedure. In such circumstances the General Counsel urges that the
undersigned find that the Respondent violated Sections 7116(a)(1) and (2)
of the Statute and order Mr. Martinez' reinstatement with back pay.
Additionally, the General Counsel contends that the Respondent committed
an independent violation of Section 7116(a)(1) of the Statute by including
a reference to Mr. Martinez' alleged abuse of the grievance procedure in
the "Proposed Notice of Removal".

The Respondent, on the other hand, takes the position that it did not
violate the Statute. According to the Respondent inasmuch as Mr. Martinez
abused the grievance process his activities in such respect did not fall
within the protection of the Statute. Further, Respondent, citing the
Authority's decision in IRS, Washington, D.C., 6 FLRA No. 23, takes the
position that in any event Mr. Martinez would have been discharged for
reasons other than his participation in activities protected by the
Statute, i.e., insubordination, causing racial tension, etc.

Contrary to the contention of Respondent, I cannot find that Mr.
Martinez' actions in actively pursuing his grievances by seeking
information and answers to questions relative thereto somehow removed the
grievances from the ambit of protected activity. It appears that
Respondent would only allow a grievant the protection of the Statute if he
merely filed a grievance and then sat back and passively awaited
Respondent's action thereon.

Inasmuch as Respondent has failed to establish any other grounds for
disqualification of Mr. Martinez' grievance activity from the protection

of the Statute, I cannot find as urged by the Respondent that Mr. Martinez
abused the grievance process. Rather I find that his actions in <u>actively</u>
pursuing his grievances were protected by the Act.[6/]

In view of this conclusion and since Mr. Martinez' protected activity
played a part in his discharge, it must now be decided, in accordance with
the Authority's decision in IRS, Washington, <u>supra</u>, whether Mr. Martinez
would have been discharged in any event for reasons unrelated to his
participation in activities protected by the Act. Respondent, of course,
takes the position that Mr. Martinez would have been discharged for
reasons other than his protected activities, namely causing racial
tension, insubordination, etc.

In this context the record establishes that the incidents cited in the
"Notice of Proposal to Remove" did in fact occur. However, it is not the
existence of grounds for removal which is the test, rather the test
appears to be whether such grounds for discharge would have been utilized
by Respondent in the absence of the employee's participation in activities
protected by the Statute.

The record further establishes that although the supervisory hierarchy
was well aware of such incidents, no written notations were ever entered
into Mr. Martinez' personnel file. In fact other than exhibiting
displeasure with Mr. Martinez' actions, no warnings or other admonishments
were given to Mr. Martinez.

To the extent that Mr. Martinez is charged with inciting racial
tensions, the participants in such conversations testified that they were
not particularly upset with Mr. Martinez' actions, and appeared to accept
such actions as an every day occurrence when dealing with Mr. Martinez.

Further, with respect to the cited incidents involving the
relationship between Ms. Rodriguez and Mr. Martinez and his daily
complaints or comments to her, it should be noted that due to the fact
that they were both of Puerto Rican ancestry and former co-workers Ms.
Rodriguez appears to have allowed Mr. Martinez greater latitude than
normally exists between a supervisor and an employee.

Given the above, I am convinced that but for Mr. Martinez'
participation in protected activities, namely filing and actively pursuing
four grievances under the negotiated grievance procedure, Respondent would
not have discharged Mr. Martinez. It was only after Mr. Martinez filed
his grievances and actively pursued same, that Respondent determined to
discharge him. To this end it approached the various employees who were

---

6/ The fact that he may have told a prospective supervisor about his
pending grievances does not alter this conclusion.

involved in the cited incidents and obtained statements concerning Mr. Martinez' alleged unacceptable activities and then proceeded to discharge him. Cf. JMC Transport, Inc. v. NLRB, F.2d , Case Nos. 84-5960 and 84-6060, (Nov. 12, 1985, 6th Cir.); DLR No. 223, Nov. 19, 1985.

Having concluded that Mr. Martinez would not have been discharged but for his participation in activities protected by the Statute, I hereby recommend that the Authority issue the following order designed to effectuate the purposes and policies of the Statute.[7]

### ORDER

Pursuant to Section 2423.29 of the Federal Labor Relations Authority's Rules and Regulations and Section 7118 of the Statute, it is hereby ordered that the Equal Employment Opportunity Commission shall:

1. Cease and desist from:

   (a) Terminating, and other discriminating against, employees because they have engaged in activities protected by the Federal Service Labor-Management Relations Statute, namely, filing and processing grievances under the contractual grievance procedure.

   (b) In any like to related manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed by the Statute.

2. Take the following affirmative actions in order to effectuate the purposes and policies of the Statute:

   (a) Offer Edgard Martinez immediate and full reinstatement to his former or substantially equivalent position, without prejudice to his seniority or other rights and privileges, and make him whole, consistent with applicable laws and regulations, for any loss of income he may have suffered by reason of his unlawful termination by paying to him a sum of money equal to the amount he would have earned or received from the date of his termination to the effective date of the offer of reinstatement, less any amount earned through other employment during the above-noted period.

---

[7] Having found that Respondent discharged Mr. Martinez solely because of his participation in activities protected by the Statute, I need not, and do not, reach the second allegation of the complaint, i.e., whether Respondent committed an independent 7116(a)(1) violation of the Statute by alluding to Mr. Martinez' protected activity in the "Notice of Proposal to Remove".

(b) Post at its Baileys Crossroads, Virginia Office, copies of the attached notice marked "Appendix" on forms to be furnished by the Federal Labor Relations Authority. Upon receipt of such forms, they shall be signed by the Director of the Office of Review and Appeals and shall be posted and maintained by her for 60 consecutive days thereafter in conspicuous places, including all bulletin boards and other places where notices to employees are customarily posted. The Director, shall take reasonable steps to insure that such notices are not altered, defaced, or covered by any other material.

(c) Pursuant to Section 2423.30 of the Authority's Rules and Regulations, notify the Regional Director, Region III, Federal Labor Relations Authority, 1111 18th Street, NW., 7th Floor, P.O. Box 33758, Washington, D.C.  20033-0758, in writing, within 30 days from the date of this Order, as to what steps have been taken to comply herewith.

BURTON S. STERNBURG
Administrative Law Judge

Dated:   November 20, 1985
         Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT SOLOMON,

       Plaintiff,

    v.                          Civil Action No.:  06-2214(RCL)

OFFICE OF THE ARCHITECT OF THE CAPITOL, *et. al.*,

       Defendant.

### ORDER

UPON CONSIDERATION of Defendants' Motion To Dismiss and Plaintiff's Opposition

thereto, the grounds stated therefor, and the entire record herein, it is on this _____ day of

_____, 2007 hereby

ORDERED that Defendants' motion should be and hereby is denied.


                         _____

                         UNITED STATES DISTRICT JUDGE


Andrea McBarnette, Esquire
Assistant United States Attorney
555 4th Street, N.W.
Washington, D. C. 20530

       and

Jeffrey H. Leib, Esquire
5104 34th Street, N.W.
Washington, D. C. 20008